UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | | |
|---|---|---|
| RELIABLE AC SERVICES LLC, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. |
| | ) | CLASS ACTION COMPLAINT |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| TRANE TECHNOLOGIES PLC, TRANE U.S. INC., MITSUBISHI ELECTRIC TRANE HVAC US LLC, LENNOX INTERNATIONAL INC., LENNOX INDUSTRIES INC., ALLIED AIR ENTERPRISES LLC, CARRIER GLOBAL CORP., VIESSMANN MANUFACTURING CO. (U.S.) INC., RHEEM MANUFACTURING CO., HEAT TRANSFER PRODUCTS GROUP, LLC, DAIKIN INDUSTRIES, LTD., DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC., DAIKIN APPLIED AMERICAS INC., GOODMAN DISTRIBUTION, INC., THERMAL-NETICS, LLC, ROBERT BOSCH LLC, ROBERT BOSCH GMBH, JC RESIDENTIAL AND LIGHT COMMERCIAL LLC, JOHNSON CONTROLS-HITACHI AIR CONDITIONING NORTH AMERICA LLC, AAON, INC., a Nevada Corporation, AAON, INC. an Oklahoma | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

Corporation, AAON COIL                )
PRODUCTS, INC., and BASX, INC.,        )
                                       )
                    Defendants.        )
                                       )
                                       )

Plaintiff Reliable AC Services LLC ("Plaintiff"), by and through the undersigned counsel, brings this civil antitrust action on its own behalf and on behalf of the proposed class of all other similarly situated persons and entities who directly purchased the above-listed Defendants' HVAC Equipment[1] in the United States ("Class Members") from the period beginning at least as early as January 1, 2020 through the present (the "Class Period").[2]

## NATURE OF THE ACTION

1.      Between January 1, 2020 and the present, HVAC Equipment prices have risen by over 50%, greatly outpacing inflation as well as the rate at which other similar goods increased, despite historical data showing that these figures have largely moved in similar ranges.

2.      At first, manufacturers blamed these increases on disruption to the supply chain due to the COVID-19 pandemic. Later, blame shifted to changes to

---

[1]  "HVAC" refers to Heating, Ventilation, and Air Conditioning. "HVAC Equipment" means the pieces and parts, separately, but also in their combined form, that work together in commercial, residential, or industrial ducted systems to control indoor temperature, humidity, and air quality. This includes, but is not limited to, air conditioning units, heat exchangers, thermostats, blower motors, air ducts and vents, furnaces, evaporator and condenser coils, refrigerants, fans, compressors, and expansion valves. A more in-depth description of the HVAC Equipment at issue can be found below in the Section titled "HVAC Equipment."

[2]  An earlier date may apply if discovery reveals that the illegal conduct began before January 1, 2020.

- 1 -

federal efficiency standards and changes to the refrigerant they used. None of these explanations were true.

3.     The truth began coming into focus in 2026, when Lennox's Chief Financial Officer ("CFO"), Michael Quenzer ("Quenzer"), finally "let the cat out of the bag." Competing on price, he said, "does not win market share." Defendants were able to increase prices in lockstep with their competitors because the industry had "generally been *disciplined* for the past several years," and Lennox intended to keep "increas[ing] [its] pricing to maintain [its] margins" because "others have generally been as well."

4.     HVAC manufacturers were able to achieve this because heating and cooling are now basic necessities in the United States, and the market is dominated by a small group of seven manufacturers: Trane, Carrier, Daikin, Bosch, Lennox, Rheem, and AAON (each defined herein) (collectively "Defendants"), who together control over 90% of the market for HVAC Equipment.

5.     Defendants conspired to fix prices, using data gleaned from "give-to-get" trade association data exchanges at the Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), as well as public statements in industry trade publications to plan and broadcast their pricing strategies.

6.     With respect to the AHRI – an industry trade association that Defendants largely control – to receive competitive intelligence about the industry,

a manufacturer had to hand over its own non-public, confidential, and proprietary information. Defendants used this data to help strategize their own price increases.

7. This went hand-in-hand with the ACHR News service, a specialized trade publication that served as Defendants' platform to broadcast price increases and telegraph their intentions on pricing and supply.

8. Through these two sources, Defendants were able to successfully conspire to unlink manufacturing costs from the prices at which they sold HVAC Equipment in order to achieve supracompetitive profits.

9. Defendants did not stop at fixing prices. When demand softened, they coordinated to restrict supply, ensuring that lower volumes would not lead to lower prices. Normally, a manufacturer that cuts production will lose customers to competing firms. That did not happen here, and is explicable only if each company understood that their competitors would not cause downward price pressure on them.

10. Direct purchasers, including Plaintiff and Class Members, are the distributors, wholesalers, and contractors who buy HVAC Equipment from Defendants, and were significantly overcharged by Defendants for HVAC Equipment as a result of the conspiracy.

11. As such, Plaintiff and Class Members bring this action to recover treble damages and the costs of this suit, including reasonable attorneys' fees against Defendants due to their violation of the Sherman Antitrust Act of 1890 ("Sherman

Act"), 15 U.S.C. §1. Additionally, Plaintiff seeks injunctive relief on behalf of itself and Class Members, including, but not limited to, the disbanding of the conspiracy.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337 because this action arises under an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

13.     This Court has personal jurisdiction under Section 12 of the Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. §22, over each and every Defendant because, among other things they all: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of HVAC Equipment throughout the United States, including in this District; (c) maintained substantial contacts within the United States, including in this District; and (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to businesses operating in the United States, including in this District, as well as to persons residing in, located in, or transacting business in the United States, including in this District. Defendants Bosch, Carrier, Daikin, Lennox, and Trane also maintain physical establishments in this District.

14.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d), as

one or more Defendants resides in or transacts business here, is licensed to do business here or is doing business here, and because a substantial portion of the anticompetitive conduct described herein was carried out in this District. Defendant Bosch's American corporate headquarters, and its American affiliate, Defendant Robert Bosch LLC, are located in this District at 38000 Hills Tech Drive, Farmington Hills, Michigan  48331.

15.     Defendants' activities, as alleged in this action, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

16.     This District is the most convenient forum for parties and witnesses to litigate this action.

## PARTIES

**Plaintiff**

17.     Plaintiff Reliable AC Services LLC is an HVAC service provider operating in Florida. Plaintiff provides a wide array of air conditioning and HVAC services, such as repairs, sales, and maintenance, among other offerings, to commercial and residential customers.

18.     Plaintiff purchased HVAC Equipment directly from one or more of the Defendants and/or their co-conspirators. Defendants' conspiracy resulted in not only Plaintiff's injury of paying artificially inflated prices for the HVAC Equipment

necessary to operate and conduct its business, but also impacted and affected other Class Members in the same manner.

**Defendants**

**The Trane Defendants**

19.     Defendant Trane Technologies plc ("Trane Technologies") is a publicly traded corporation headquartered and incorporated in Dublin, Ireland. Trane Technologies' North American and United States headquarters are in Davidson, North Carolina. Trane Technologies' common stock trades on the New York Stock Exchange ("NYSE"). Trane Technologies operates commercial sales offices for HVAC Equipment in Michigan, and an HVAC Equipment commercial manufacturing facility in Grand Rapids, Michigan. Trane Technologies manufactures and markets HVAC Equipment multiple brands and product lines, including Trane, American Standard, RunTru, Ameristar, and others. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

20.     Defendant Trane U.S. Inc. is a Delaware corporation headquartered in Davidson, North Carolina that manufactures HVAC systems and energy-efficient indoor climate solutions for residential and commercial applications. Trane U.S. Inc. is a subsidiary of Trane Technologies and is licensed to do business in the State of

- 6 -

Michigan. It is defined as the "seller" for Trane Supply in the United States per the conditions of sale available on Trane Supply's website.

21.    Defendant Mitsubishi Electric Trane HVAC US LLC is a joint venture between Trane Technologies and Mitsubishi Electric US, Inc., formed in 2018. The joint venture distributes products under the Mitsubishi Electric brand, as well as specific Trane and American Standard branded systems, and implemented Defendants' supracompetitive pricing. Mitsubishi Electric Trane HVAC US LLC is a Delaware limited liability company headquartered in Suwanee, Georgia.

22.    Defendants Trane Technologies, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US LLC are referred to collectively as "Trane" or the "Trane Defendants" in this Class Action Complaint ("Complaint"). The Trane Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Trane supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

23.    The Trane Defendants conduct business as a single enterprise under the control of Trane Technologies. Trane Technologies sets pricing strategy for its

HVAC Equipment operations in North America, and its subsidiaries and joint ventures execute that strategy. The conspiracy alleged in this Complaint is not among or between the Trane Defendants; rather, Trane, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Trane Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment in interstate commerce, or set prices and strategy for the same, during the Class Period.

**The Lennox Defendants**

24.    Defendant Lennox International Inc. ("Lennox International") is a publicly traded Delaware corporation headquartered in Richardson, Texas. Lennox International, either directly or through its subsidiaries, operates stores selling its HVAC Equipment products in Michigan. During the Class Period, Lennox International and/or its predecessors, wholly owned or controlled subsidiaries, and/or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

25.    Defendant Lennox Industries Inc. ("Lennox Industries") is a wholly owned subsidiary of Lennox International. Lennox Industries is a Delaware corporation headquartered in Richardson, Texas. Lennox Industries is licensed to do business in the State of Michigan. Lennox Industries manufactures and markets HVAC Equipment under the Lennox brand and several product lines.

26.     Defendant Allied Air Enterprises LLC ("Allied Air") is a wholly owned subsidiary of Lennox Industries. Allied Air is a Delaware limited liability company headquartered in West Columbia, South Carolina. Allied Air manufactures and markets HVAC Equipment under several brands and product lines, including Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, and Concord.

27.     Defendants Lennox International, Lennox Industries, and Allied Air are referred to collectively as "Lennox" or the "Lennox Defendants" in this Complaint. The Lennox Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Lennox and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly and/or through wholly owned or controlled affiliates, to purchasers in the United States, or set prices and strategy for the same. Upon information and belief, Lennox supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

28.     The Lennox Defendants operate as a single enterprise under the direction and control of Lennox International. Lennox International sets pricing strategy for its HVAC Equipment operations, and its wholly owned subsidiaries implement that strategy. The conspiracy alleged in this Complaint is not among or between the Lennox Defendants; rather, Lennox, acting as a single enterprise,

- 9 -

conspired with the other Defendant families identified herein. Each Lennox Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period under distinct brand names and product lines – Lennox Industries under the Lennox brand, and Allied Air under the Allied, Armstrong Air, AirEase, Ducane, and Concord brands. Both subsidiaries announced price increases throughout the Class Period, often within days of each other at identical percentages, executing Lennox International's unified pricing directives.

**The Carrier Defendants**

29.     Defendant Carrier Global Corp. ("Carrier Global" is a publicly traded Delaware corporation headquartered in Palm Beach Gardens, Florida. Carrier's common stock trades on the NYSE under the ticker symbol "CARR." Carrier Global operates a commercial service facility for HVAC Equipment in Novi, Michigan. Carrier Global's website includes a page entitled "Find a Carrier Expert–Michigan" identifying over 100 locations in the State of Michigan. Carrier Global manufactures and markets HVAC Equipment under several brands and product lines, including Carrier, Bryant, Toshiba, Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, International Comfort Products ("ICP"), Keeprite, Day & Night, Viessmann, and others.

- 10 -

30. Defendant Viessmann Manufacturing Co. (U.S.) Inc. is part of the larger Viessmann Climate Solutions entity that Carrier Global acquired in 2024. It serves as Viessmann's Climate Solutions' primary manufacturing and distribution facility in the United States, is now a subsidiary of Carrier Global and is a Rhode Island corporation headquartered in Warwick, Rhode Island. According to the Michigan Secretary of State's website, Viessmann Manufacturing Co. (U.S.) Inc. is licensed to do business in the State of Michigan.

31. Defendants Carrier Global and Viessmann Manufacturing Co. (U.S.) Inc. are referred to collectively as "Carrier" or the "Carrier Defendants" in this Complaint. The Carrier Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Carrier and/or its predecessors, wholly owned or controlled subsidiaries, joint-ventures, distributors, and/or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Carrier supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

32. The Carrier Defendants operate as a single enterprise under the direction and control of Carrier Global. Carrier Global sets pricing strategy for its HVAC Equipment operations in North America, and its subsidiaries implement that

- 11 -

strategy. The conspiracy alleged in this Complaint is not among or between the Carrier Defendants; rather, Carrier, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Carrier Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period and each bear direct or successor liability for the overcharges alleged herein. Viessmann Manufacturing Co. (U.S.), Inc. bears successor liability for its pre-acquisition pricing conduct and, following its acquisition by Carrier in 2024, implemented Carrier's supracompetitive pricing strategy.

**The Rheem Defendants**

33. Defendant Rheem Manufacturing Co. is a privately owned Delaware corporation headquartered in Atlanta, Georgia. Rheem contracts with HVAC Equipment service providers in the Detroit, Michigan area. Rheem Manufacturing Co. entered commercial HVAC Equipment markets in the 1970s when it acquired Acme Industries, then headquartered in Jackson, Michigan. Rheem Manufacturing Co. is a subsidiary of Paloma Industries, Ltd., a privately held company based in Nagoya, Japan, which acquired Rheem Manufacturing Co. in 1988. Rheem Manufacturing Co. manufactures and markets HVAC Equipment under several brands and product lines, including Rheem, Ruud, WeatherKing, Sure Comfort, and

others. In October 2024, Rheem Manufacturing Co. acquired Nortek Global HVAC from Madison Industries.

34. Defendant Heat Transfer Products Group, LLC ("HTPG") manufactures commercial HVAC Equipment sold under brands such as Russell, Witt, Kramer, and ColdZone. HTPG is a division of Rheem Manufacturing Co. and is a Delaware limited liability company headquartered in Lawrenceville, Georgia.

35. Defendants Rheem Manufacturing Co. and HTPG are referred to collectively as "Rheem" or the "Rheem Defendants" in this Complaint. The Rheem Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Rheem and/or its predecessors, wholly owned or controlled subsidiaries, distributors, and/or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Rheem supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District.

36. The Rheem Defendants operate as a single enterprise under the direction and control of Rheem Manufacturing Co. Rheem Manufacturing Co. sets pricing strategy for its HVAC Equipment operations, and HTPG, as a division of Rheem Manufacturing Co., implements that strategy for commercial HVAC Equipment. The conspiracy alleged in this Complaint is not among or between the

- 13 -

Rheem Defendants; rather, Rheem, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Rheem Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period. Rheem also bears successor liability for the anticompetitive conduct of Nortek Global HVAC, which Rheem acquired in October 2024, and Nortek Air Solutions – entities that announced price increases in furtherance of the conspiracy throughout the earlier years of the Class Period.

**The Daikin Defendants**

37.   Defendant Daikin Industries, Ltd. ("Daikin") is a publicly traded corporation headquartered and incorporated in Osaka, Japan. Daikin's United States corporate headquarters are in New York, New York. In 2012, Daikin acquired Goodman, a residential HVAC manufacturer headquartered in Houston, Texas. In 2022, Daikin acquired Thermal-Netics, LLC, an HVAC Equipment sales and services provider headquartered in Auburn Hills, Michigan. Daikin manufactures and markets HVAC Equipment under several brands and product lines, including Daikin, Amana, Goodman, and others.

38.   Defendant Daikin Comfort Technologies North America, Inc. ("Daikin Comfort Technologies") is a Delaware corporation and subsidiary of Daikin headquartered in Waller, Texas. At its "Daikin Texas Technology Park" outside

- 14 -

Houston, Texas, Daikin Comfort Technologies engineers, manufactures, markets, and sells HVAC Equipment under several brand and product lines including Daikin, Goodman, Quietflex, and Amana. Daikin changed the name of its United States subsidiary Goodman Global Group, Inc. to Daikin Comfort Technologies in April 2022.

39. Defendant Thermal-Netics, LLC is a Delaware limited liability company headquartered in Auburn Hills, Michigan, and a subsidiary of Daikin. According to the Michigan Secretary of State's website, Thermal-Netics, LLC is licensed to do business in the State of Michigan. Thermal-Netics, LLC manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

40. Defendant Daikin Applied Americas Inc. is a Delaware corporation headquartered in Minneapolis, Minnesota, and a subsidiary of Daikin. According to the Michigan Secretary of State's website, Daikin Applied Americas Inc. is licensed to do business in the State of Michigan. Daikin Applied Americas Inc. manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

41. Defendant Goodman Distribution, Inc. is a Texas corporation headquartered in Dallas, Texas, and a subsidiary of Daikin. Goodman Distribution, Inc. sells residential HVAC Equipment under the Daikin and Goodman brands directly to HVAC contractors.

- 15 -

42.     Defendants Daikin, Daikin Comfort Technologies North America, Inc., Daikin Applied Americas Inc., Goodman Distribution, Inc. and Thermal-Netics, LLC are referred to collectively as "Daikin" or the "Daikin Defendants" in this Complaint. The Daikin Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, joint-ventures, distributors, and/or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Daikin supplied HVAC Equipment to HVAC distributors, supply houses, and contractors/dealers, including in the State of Michigan and in this District during the Class Period.

43.     The Daikin Defendants operate as a single enterprise under the direction and control of Daikin. Daikin sets pricing strategy for its HVAC Equipment operations worldwide, including in the United States, and its subsidiaries implement that strategy. The conspiracy alleged in this Complaint is not among or between the Daikin Defendants; rather, Daikin, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Daikin Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period. Daikin Comfort Technologies North America, Inc. –

- 16 -

formerly Goodman Global Group, Inc. – and Thermal-Netics, LLC each bear direct and successor liability for their pricing conduct before and after acquisition by Daikin Industries, Ltd.

**The Bosch Defendants**

44.     Defendant Robert Bosch LLC is a Delaware limited liability company, a wholly owned subsidiary of Robert Bosch GmbH, and serves as the corporate headquarters for North America. It is headquartered in this District, in Farmington Hills, Michigan and, according to the Michigan Secretary of State's website, is licensed to do business in the State of Michigan.

45.     Defendant Robert Bosch GmbH is a privately owned corporation headquartered and incorporated in Gerlingen, Baden-Württemberg, Germany. Robert Bosch GmbH's United States corporate headquarters are in Farmington Hills, Michigan. Robert Bosch GmbH manufactures and markets HVAC Equipment under several brands and product lines, including Bosch, York, Champion, Coleman, IVT, Luxaire, Hitachi, TempMaster, Guardian, and others. During the Class Period, Robert Bosch GmbH and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

46.     Defendant JC Residential and Light Commercial LLC ("JC RLC") is a Delaware limited liability company, a subsidiary of Robert Bosch GmbH, and

headquartered in Farmington Hills, Michigan. JC RLC is licensed to transact business in the State of Michigan. Robert Bosch GmbH acquired JC RLC in 2025 from Johnson Controls International PLC's Residential and Light Commercial HVAC.

47.     Defendant Johnson Controls-Hitachi Air Conditioning North America LLC ("JCH North America") is a Delaware limited liability company, a subsidiary of Robert Bosch GmbH, and headquartered in Dallas, Texas. Robert Bosch GmbH acquired JCH North America; it was formerly a joint venture between Johnson Controls and Hitachi Global Life Solutions, Inc. JCH North America remains a subsidiary of Robert Bosch GmbH and is licensed to transact business in the State of Michigan.

48.     Defendants Robert Bosch GmbH, Robert Bosch LLC, JC RLC, and JCH North America are referred to collectively as "Bosch" or the "Bosch Defendants" in this Complaint. The Bosch Defendants manufacture both residential and commercial HVAC Equipment in the United States. During the Class Period, Bosch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Bosch supplied HVAC Equipment to HVAC distributors, supply houses, and/or

contractors/dealers, including Johnstone Supply, which operates many locations in this District.

49.     The Bosch Defendants operate as a single enterprise under the direction and control of Robert Bosch GmbH. Robert Bosch GmbH sets pricing strategy for its HVAC Equipment operations worldwide, including in the United States, and its subsidiaries implement that strategy. The conspiracy alleged in this Complaint is not among or between the Bosch Defendants; rather, Bosch, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Bosch Defendant is named individually because each manufactured, marketed, or sold HVAC Equipment, or set prices and strategy for the same, in interstate commerce during the Class Period, each is subject to personal jurisdiction in this District, and each bears direct or successor liability for the overcharges alleged herein. JC RLC and JCH North America, in particular, bear successor liability for the anticompetitive conduct of Johnson Controls' HVAC business, which Robert Bosch GmbH acquired in a deal announced in July 2024 and which closed in July 2025 – conduct that Johnson Controls engaged in throughout the earlier years of the conspiracy.

**The AAON Defendants**

50.     Defendant AAON, Inc. ("AAON, Inc. (Nevada)") is a publicly traded Nevada corporation headquartered in Tulsa, Oklahoma. AAON's common stock

- 19 -

trades on NASDAQ under the ticker symbol "AAON." AAON manufactures and markets primarily commercial HVAC Equipment, including rooftop units, air handling units, chillers, and condensing units. Airtech Equipment serves as the primary authorized representative for AAON HVAC Equipment in Michigan, with offices in this District. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, distributors and/or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

51.     Defendant AAON, Inc. ("AAON, Inc. (Oklahoma)") is a subsidiary of the AAON, Inc. entity referenced in the immediately preceding paragraph. AAON, Inc. (Oklahoma) is an Oklahoma corporation headquartered in Tulsa, Oklahoma and engineers, manufactures, and sells highly configurable HVAC systems.

52.     Defendant AAON Coil Products, Inc. is a Texas corporation headquartered in Longview, Texas, and a subsidiary of AAON, Inc. AAON Coil Products, Inc. engineers and manufactures semi-custom and custom HVAC systems, as well as heating and cooling coils for use in HVAC Equipment.

53.     Defendant BASX, Inc. is an Oregon corporation headquartered in Redmond, Oregon, and a subsidiary of AAON. BASX, Inc. engineers, manufactures, and sells a wide range of custom, high-performance cooling solutions and customized air handlers and modular solutions for a variety of markets.

54.     Defendants AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc. are referred to collectively as "AAON" or the "AAON Defendants" in this Complaint. The AAON Defendants manufacture HVAC Equipment in the United States, including both residential and commercial HVAC Equipment. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, AAON supplied HVAC Equipment to HVAC distributors, supply houses, and/or contractors/dealers, including in this District.

55.     The AAON Defendants operate as a single enterprise under the direction and control of AAON, Inc. (Nevada). The conspiracy alleged in this Complaint is not among or between the AAON Defendants; rather, AAON, Inc. (Nevada) acting as a single enterprise, conspired with the other Defendant families identified herein. Each AAON Defendant is named individually because each engineered, manufactured, or sold HVAC Equipment in interstate commerce during the Class Period. AAON, Inc. (Nevada) sets pricing strategy for its HVAC Equipment operations, and its subsidiaries implement that strategy.

**AHRI, ACHR, Watsco, and Others' Role in the Conspiracy**

56.     AHRI is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. AHRI is based in Arlington, Virginia. As alleged herein, AHRI had a prominent role in facilitating the conspiracy because: (a) executives from Defendants are on AHRI's Board of Directors ("Board") or are Officers; (b) AHRI provides opportunities for Defendants to interact at regular intervals; (c) information flows through, and is passed between Defendants during AHRI events; (d) information is related to pricing and/or market conditions; and (d) Defendants act in parallel after AHRI events.

57.     AHRI boasts that its manufacturer members' HVAC Equipment "account[s] for more than 90 percent of the residential and commercial equipment manufactured and sold in North America."[3] This is not surprising because there are over 200 AHRI members, not including affiliate members, AHRI staff, Board Advisory Members, Standing and Business Committees, Official Representatives, etc.[4]

---

[3]   Air-Conditioning, Heating, & Refrigeration Inst., https://www.ahrinet.org/ (last visited Apr. 26, 2026).

[4]   Air-Conditioning, Heating, & Refrigeration Inst., *AHRI Members*, https://www.ahrinet.org/get-involved/ahri-members (last visited Apr. 26, 2026).

58.     Six of the seven Defendant families are members of AHRI's board, and all seven are entangled with AHRI's leadership. Rheem Manufacturing Co.'s Mike Branson ("Branson") is the 2026 Chairman, and Trane's Holly Paeper is the Vice Chairman, serving as Officers of AHRI. Bosch's David Budzinski, Lennox's Alok Maskara ("Maskara"), Carrier's Gaurang Pandya, and Daikin's Yogi Uemura are on AHRI's Board. Because Defendants' executives serve in AHRI's leadership roles, they have deep influence over AHRI members and other Officers and Directors, as well as over setting industry standards.

59.     Every year, AHRI hosts four events for its members to attend, not including committee meetings and networking events. The four events are the: (1) AHRI Expo; (2) AHRI State Summit; (3) AHRI Policy Symposium; and (4) AHRI Leadership Forum. Aside from these events, there are two additional events on AHRI's Events Calendar that appear to be closed to members: the Sector Leadership Council Meeting and the AHRI Board of Directors Meeting. The Sector Leadership Council and the Board meet twice per year. AHRI's annually scheduled events, including private meetings not open to members, provide a conducive forum for Defendants to engage with each other on a regular and predicable basis.

60.     AHRI describes itself as "an impartial central agency" for industry data. In practice, it operates an information exchange that makes each Defendant's nonpublic competitive data available to every other Defendant. The system works

- 23 -

on a give-to-get basis: to receive industry reports, a manufacturer must hand over its own confidential data on bookings, shipments, sales volume, inventories, and regional market activity. AHRI then compiles the data that is distributed monthly, quarterly, and annually. AHRI has stated that these reports allow each participant to "really get an idea of exactly where they stand in the market"[5] for every product it manufactures. The reports are "based on what the members would like to buy in the reports, what data they'd like to provide."[6] In other words, AHRI gave each Defendant a regularly updated scorecard showing whether its competitors were holding the line.

61.    AHRI provides its member manufacturers with detailed market intelligence that facilitates coordination among competitors. AHRI touts that members can "[g]ain insight on the scope, size, and growth of the US heating, air conditioning, and commercial refrigeration industry."[7] Through its reporting programs, AHRI collects company-specific data – including bookings, unit shipments, sales volume, inventory levels, exports, and regional market activity – and aggregates that information into periodic reports distributed exclusively to

---

[5]   YouTube, *AHRI Analytics* (July 18, 2023), https://www.youtube.com/watch?v=P6PMdRilHD0.

[6]   *Id.*

[7]   Air-Conditioning, Heating, & Refrigeration Inst., *Statistics*, https://www.ahrinet.org/analytics/statistics (last visited Apr. 26, 2026).

participating members. These reports include monthly shipment data and historical trend analyses that allow manufacturers to track industry-wide output, monitor demand conditions, and evaluate competitors' performance across product categories.

62.    In 2020, AHRI launched a new "Executive Dashboard" and companion analytics application. AHRI described the Executive Dashboard as providing "real-time program performance data, industry statistics, and the predictive analytics needed to drive results."[8] The application allowed users to access "data related to individual product performance, which can then be compared to the data of other AHRI certification program participants, along with predictive analysis."[9] In practical terms, the Executive Dashboard gave each Defendant the ability to monitor, in real time, whether its competitors' pricing and output was consistent with the coordinated strategy.

63.    AHRI provided additional forums for competitors to interact directly. Darcy Lee of Trane chaired its Standards Policy Committee in 2024. The committee "defines the policies and procedures related to development and approval of AHRI

---

[8]    Air-Conditioning, Heating, & Refrigeration Inst., *Analytics Services, Background*, https://portal.ahrianalytics.org/aboutanalytics (last visited Apr. 26, 2026).

[9]    *Id.*

standards, guidelines, and stand-alone appendices."[10] Voting members also included executives from Carrier (Dominique Taudin), Lennox (Bruce Perkins), Rheem (Sachin Nehete), and Johnson Controls (now Bosch) (Patrick Marks), meaning that five of the seven Defendant groups sat on a single working committee. AHRI also operates a chat platform called "AHRI Connect," a members-only portal where industry participants "can take part in vibrant discussions and work collaboratively with colleagues across the globe, access documentation instantaneously, and stay abreast of critical news updates."[11]

64.    AHRI restricts access to these reports to participating member companies, ensuring that only competing manufacturers, rather than customers or the public, receive this information. This closed system further facilitated coordination by providing Defendants with exclusive insight into market conditions and competitor behavior while shielding that information from market participants who might otherwise respond competitively.

---

[10]   Air-Conditioning, Heating, & Refrigeration Inst., *AHRI Policy & Procedures for the Development of Standards*, https://www.ahrinet.org/sites/default/files/Standards%20Policy%20Procedure%20 2025.pdf.

[11]   AHRI Connect, *Welcome to AHRI Connect*, https://connect.ahrinet.org/home (last visited Apr. 26, 2026).

65.     Defendants used AHRI's reporting system to monitor one another's conduct and to ensure adherence to coordinated pricing and output strategies. By reviewing AHRI's monthly and periodic reports, Defendants gained visibility into whether competitors maintained elevated pricing, adjusted production levels, or deviated from expected market behavior. This shared access to timely, aggregated data reduced uncertainty, discouraged price competition, and enabled Defendants to align their conduct in furtherance of the unlawful scheme alleged herein.

66.     ACHR News is a specialized trade publication covering the HVAC industry. Throughout the Class Period, Defendants used it to announce price increases to the market.

67.     Those announcements followed a pattern. Defendants used ACHR News not merely to announce price increases but to communicate with each other. The pattern was consistent throughout the Class Period: a Defendant would publish the precise percentage of an upcoming price increase, the specific product lines affected, and the exact effective date, typically weeks before implementation.

68.     In a free and competitive market, that level of advance specificity is irrational under economic game theory.[12] For example, a manufacturer that

---

[12] Clay Halton, *Iterated Prisoner's Dilemma Explained: Strategies & Examples*, Investopedia (Dec. 14, 2025), https://www.investopedia.com/terms/i/iterated-prisoners-dilemma.asp.

broadcasts a 9% increase three weeks before it takes effect risks losing customers to competitors who defect and use that information to their own advantage in order to reap additional profits at the expense of their competition. Yet after the COVID-19 pandemic, across six years and more than 40 published price increases, each Defendant was consistently rewarded rather than punished as competitors matched or exceeded the announced increase, usually within days, at nearly identical percentages, through the same publication.

69.     This iterative process is precisely how co-conspirators confirm adherence to an agreement, flipping the competition that is normally associated with free markets to one where supposed competitors are working together to maximize their collective profits, as opposed to their individual profits.[13]

70.     Between January 2020 and the present, there were more than 40 price increase announcements by Defendants. Across those announcements, a consistent pattern emerges: one Defendant announces a specific increase through ACHR News, and within days or weeks, competitors announce increases at the same or nearly identical percentages, for the same product categories, through the same publication. The increases cluster in narrow bands. The follow-on timing is rapid. And, throughout the entire Class Period, the pattern holds without meaningful deviation.

---

[13]  *Id.*

71.     Watsco, Inc. ("Watsco") is a publicly traded Florida corporation that is headquartered in Miami, Florida.[14] Watsco is the largest distributor of HVAC Equipment in the United States.[15] Watsco serves as a critical intermediary between Defendants and downstream purchasers. Watsco purchases HVAC Equipment from multiple Defendants[16] and resells those products through a network of subsidiaries, joint ventures, and distribution branches throughout the United States.

72.     Watsco grew to be the largest North American HVAC Equipment distributor using a "'buy and build' philosophy," leveraging an acquisition-based business model.[17] To date, Watsco has completed 72 acquisitions, with the most recent one of Southern Ice Equipment Distributors, based in Lafayette, Louisiana on May 5, 2025.[18] Now, Watsco holds approximately 15% of the market share of a

---

[14] GlobalData, *Watsco, Inc.: Locations*, https://www.globaldata.com/company-profile/watsco-inc/locations/#:~:text=Head%20Office,www.watsco.com          (last visited Apr. 26, 2026).

[15] Watsco, Inc., *Watsco Completes Acquisition of Temperature Equipment Corporation* (Apr. 12, 2021), https://investors.watsco.com/news-releases/news-release-details/watsco-completes-acquisition-temperature-equipment-corporation.

[16] Watsco, Inc., *Our Businesses*, https://www.watsco.com/business-units/ (last visited Apr. 26, 2026).

[17] Watsco, Inc., *Business Strategy*, https://www.watsco.com/about-us/strategy/ (last visited Apr. 26, 2026).

[18] Watsco, Inc., *Watsco Acquires Southern Ice Equipment Distributors* (May 5, 2025),          https://www.watsco.com/newsitem/watsco-acquires-southern-ice-equipment-distributors/.

roughly $50 billion North American HVAC distribution market.[19] This expansive growth and market position provide Watsco with substantial influence over HVAC distribution channels, enabling it to implement and reinforce the coordinated pricing practices alleged herein.

73.    One of Watsco's principal distribution arms is Gemaire Distributors, LLC ("Gemaire"). Gemaire is a Delaware limited liability company that is headquartered in Deerfield Beach, Florida, and a wholly owned subsidiary of Watsco. Gemaire operates a widespread network of distribution branches and serves as a major distributor of HVAC Equipment across the United States. Gemaire is North America's largest Rheem Distributor.[20] Gemaire also distributes American Standard, Frigidaire, and Maytag products.[21] Upon information and belief, Rheem set and controlled pricing of Rheem HVAC Equipment Gemaire outlets supplied to Class Members.

---

[19] *What is Competitive Landscape of Watsco Company?*, MatrixBCG (Mar. 8, 2025), https://matrixbcg.com/blogs/competitors/watsco.

[20] *Gemaire Distributors & Rheem Establish Centralized Distribution Hub for Commercial HVAC Equipment in Florida*, HVAC Insider (Oct. 8, 2020), https://hvacinsider.com/gemaire-distributors-and-rheem-establish-centralized-distribution-hub-for-commercial-hvac-equipment-in-florida/.

[21] *Gemaire Distributors Company Overview*, LeadIQ, https://leadiq.com/c/gemaire-distributors/5a1d8a75240000240063e99e (last visited Apr. 26, 2026).

74. For purposes of this Complaint, Rheem and Gemaire operated as a single economic entity, with Rheem directing and controlling the pricing and sale of Rheem HVAC Equipment distributed through its Watsco-owned distributor, Gemaire, to Class Members.

75. Further, Watsco maintains extensive joint venture relationships with Carrier through entities including Carrier Enterprise I, II, and III, and TEC Distribution LLC, which collectively operate integrated HVAC distribution networks across the United States and North America. These ventures combine distribution assets and locations contributed by both Watsco and Carrier and serve as primary channels for the sale of Carrier-branded HVAC Equipment.

76. Watsco holds controlling ownership interests in these joint ventures – typically approximately 80%, and 60% in Carrier Enterprise III – while Carrier retains significant minority stakes. Through these arrangements, Watsco and Carrier align their financial interests and coordinate distribution operations in the United States. In 2021, the joint ventures with Carrier represented 56% of Watsco's revenues for the fiscal year.

77. Carrier sets pricing for its HVAC Equipment distributed through these joint ventures, and the ventures implement those pricing decisions across their distribution networks. Upon information and belief, Watsco, through its controlling ownership and operational role, ensures consistent execution of those pricing

practices across regions. Through this integrated structure, Carrier and Watsco act in concert in the pricing and sale of HVAC Equipment, reinforcing uniform pricing and supporting the maintenance of prices above competitive levels.

78.    Watsco possessed direct insight into, benefited from, and actively carried out the coordinated conduct alleged herein. Throughout the Class Period, Watsco maintained regular communications with its original equipment manufacturer partners and acknowledged its role in aligning pricing practices across manufacturers. Watsco's own executives admitted that the company "collaborat[es] closely with [its] OEM partners on current and future pricing actions,"[22] that its OEM partners "aggressively . . . collaborate with [Watsco] to drive growth,"[23] and has "visibility into every manufacturer's pricing" prior to public announcements.[24] Watsco further confirmed that it would "implement [manufacturers'] price increases

_____

[22] Watsco, Inc., *2025 Q1 Earnings Call Transcript* (Apr. 23, 2025), https://www.earningscall.ai/stock/transcript/WSO-2025-Q1.

[23] *Watsco, Inc. (WSO) Q3 2023 Earnings Call Transcript*, SA Transcripts (Oct. 19, 2023), https://seekingalpha.com/article/4641937-watsco-inc-wso-q3-2023-earnings-call-transcript.

[24] Watsco, Inc., *Q3 2024 Earnings Call Transcript* (Oct. 23, 2024), https://seekingalpha.com/article/4728811-watsco-inc-wso-q3-2024-earnings-call-transcript?messageid=confirm_registration_en&open_reset_password=false&origin=confirm_registration&source=email_registration_email:confirm_registration&utm_campaign=%7Cconfirmation_link_registration_en&utm_medium=email&utm_source=seeking_alpha.

instantaneously".[25] Consistent with these practices, Watsco described industry pricing, margins, and discipline as "across the board . . . pretty consistent and good," and expressed the expectation that such conditions would continue.[26]

79.    Other persons, firms, corporations, and business entities that are not named as Defendants in this action, nonetheless, participated as co-conspirators, performed acts, and made statements to carry out this conspiracy. Accordingly, Defendants are jointly and severally liable for their co-conspirators' acts regardless of whether those co-conspirators are named as Defendants in this Complaint.

80.    Each co-conspirator, through its duly authorized officers, managers, agents, employees, or representatives, authorized, directed, and carried out the acts alleged herein while actively managing and controlling its affairs. Likewise, Defendants, through their officers, agents, employees, and representatives, authorized, directed, and carried out the acts attributed to them while actively managing their business and operations. Each corporate entity, through its officers, directors, agents, employees, and representatives, engaged in the acts referenced

---

[25] *Watsco, Inc. (WSO) Q1 2025 Earnings Call Transcript* (Apr. 23, 2025), https://seekingalpha.com/article/4777250-watsco-inc-wso-q1-2025-earnings-call-transcript.

[26] *Watsco, Inc. (WSO) Q4 2025 Earnings Call Transcript* (Feb. 17, 2026), https://seekingalpha.com/article/4870965-watsco-inc-wso-q4-2025-earnings-call-transcript.

herein while actively managing, directing, controlling, or conducting its business and affairs.

81.   Each Defendant, in connection with the acts, violations, and course of conduct alleged herein, acted as an agent of, joint venturer with, and on behalf of the other Defendants.

82.   Defendants are also liable for acts taken in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

83.   The United States HVAC Equipment market generated over $55 billion in 2025.[27] Defendants control nearly 90% of the market, as illustrated below.[28]

---

[27] Mordor Intelligence, *United States HVAC Equipment Market Size & Share Analysis - Growth Trends & Forecast* (2026-2031), https://www.mordorintelligence.com/industry-reports/us-hvac-equipment-market (last visited Apr. 26, 2026).

[28] BuildOps, *North American HVAC Equipment Market, by Manufacturer, and by Market Share* (Feb. 20, 2023), https://buildops.com/resources/north-american-hvac-equipment-market-chart/.

**Figure 1** – Market Share



84.    Plaintiff and Class Members allege that Defendants entered into an agreement from at least as early as January 1, 2020, to fix, raise, maintain, and stabilize HVAC Equipment prices sold in the United States.

85.    In short, Defendants achieved this through the exchange of non-public competitive data through AHRI, public signaling of price increases, and coordinated restrictions on production. The conspiracy generated unprecedented profit margins for Defendants and billions of dollars in overcharges paid by Plaintiff and the Class.

**HVAC Equipment**

86.    HVAC Equipment – consisting of furnaces, air conditioners, heat pumps, air handlers, and similar systems – is manufactured to standardized industry specifications.[29] This uniformity means a residential furnace from Trane can seamlessly replace a Carrier or Lennox model, and a commercial rooftop unit from Daikin is functionally interchangeable with one from Rheem or AAON. Therefore, purchasing decisions hinge predominantly on price. This standardization has also enabled a coordinated conspiracy among manufacturers: when products are virtually identical, it becomes easy for competitors to agree not to undercut each other's prices, negating the need for intricate customer or territory divisions.

87.    HVAC Equipment is categorized into residential and commercial systems. Residential HVAC systems consist of smaller systems, like furnaces, heat pumps, air conditioners, and air handlers connected by ductwork.[30] On the other hand, Commercial HVAC Equipment is more complex, can manage multiple zones,

---

[29] ServiceTitan, *HVAC Requirements & Regulations: What You Need to Know for 2026 & Beyond* (Aug. 23, 2021), https://www.servicetitan.com/blog/hvac-regulations#:~:text=the%20Canadian%20government.-,HVAC%20efficiency%20standards,HVAC%20tech%20certification.

[30] Majestic Air Conditioning, *How a Residential HVAC System Works: A Homeowner's Guide*, https://www.majestic-ac.com/how-a-residential-hvac-system-works-a-homeowners-guide/ (last visited Apr. 26, 2026).

and is used in various settings, including restaurants, office buildings, shopping centers, hospitals, and data centers.[31]

**Residential HVAC**

88.     Residential HVAC Equipment is generally smaller and simpler than commercial systems. Typically, they feature a "split" system, which consists of one indoor unit and one outdoor condenser.[32] Residential HVAC systems are designed to regulate indoor temperature, humidity, and air quality in homes. Key components of these systems include furnaces, heat pumps, air conditioners, and air handlers. Together, these components work to circulate heated or cooled air throughout the home via ductwork.

---

[31] Trillium, *What is Commercial HVAC? Everything You Need to Know*, https://trilliumfacility.com/what-is-commercial-hvac/ (last visited Apr. 27, 2026).

[32] *See* We Care A/C Plumbing & Electric, *Exploring the Most Common HVAC System Types for Climate Control* (Aug. 21, 2023), https://wecareheatandair.com/fun-facts/exploring-the-most-common-hvac-system-types-for-climate-control/.

**Figure 2-** Residential HVAC Split System[33]



89.    In addition to split systems, there are two other types of residential HVAC systems: (a) Packaged units, where all components are housed in a single outdoor unit that combines heating, cooling, and ventilation all in one cabinet, commonly used in homes without basements; and (b) ductless mini-splits, which are individual units that heat or cool specific rooms without ductwork.

---

[33] Facebook, HVAC World's Post (Jan. 26, 2025), https://www.facebook.com/FirehawkBrewpub/posts/this-diagram-illustrates-the-basic-components-of-a-split-system-air-conditioning/997419842443548/.

**Figure 3**- Diagram of a Packaged HVAC Residential System[34]



90.     Ductless mini-splits are not included as the products at issue in this Complaint.

---

[34]  LinkedIn,                    Nijamudeen                    Asan                    Usan, https://www.linkedin.com/posts/nijamasan_hvac-hvaclife-hvactech-activity-7320647040059777024-2kaa/ (last visited Apr. 26, 2026).

**Commercial HVAC**

91.    Commercial HVAC Equipment is used in various settings, including shops, grocery stores, office buildings, hospitals, and data centers. Therefore, these systems must manage higher capacities and maintain different temperatures in various zones. The main types of commercial HVAC products include: (a) packaged units: self-contained systems that provide heating, cooling, and ventilation in a single cabinet, usually installed on rooftops or ground level for smaller buildings; (b) ducted split systems: outdoor condensing units paired with indoor air handlers, connected by ductwork; (c) variable refrigerant flow ("VRF") systems, which connect multiple indoor units to one or more outdoor units for room-by-room temperature control in larger buildings; and (d) chillers: equipment that produces chilled water to cool entire buildings.[35]

---

[35] Chiller Systems Service, *Answering Your Questions About Commercial HVAC Systems Types*, https://chillersystemsservice.com/blog/commercial-hvac-system-types/ (last visited Apr. 26, 2026).

**Figure 4**- Packaged Commercial Unit HVAC[36]



**Figure 5**- Ducted Split System[37]



---

[36] Industrial Quick Search, *Industrial Air Conditioners*, https://www.iqsdirectory.com/articles/air-conditioner/industrial-air-conditioners.html (last visited Apr. 26, 2026).

[37] MEPAcademy, *How HVAC Split System Air Conditioners Work* (Oct. 20, 2022), https://mepacademy.com/how-hvac-split-system-air-conditioners-work/.

**Figure 6**- VRF HVAC Commercial System



**Figure 7**- Chiller HVAC System[38]



---

[38] Certified Commercial Property Inspectors Assn., *Central Plant Systems & Chilled Water Systems*, https://ccpia.org/central-plant-systems-and-chilled-water-systems/ (last visited Apr. 26, 2026).

**HVAC Pricing**

92.     Residential HVAC Equipment prices are generally consistent; they typically range from $4,000 to $13,000, depending on the chosen model. Variations in price arise from efficiency ratings, speed options, size, noise reduction, and additional features. Installation costs also vary based on labor, home size, ductwork, and system complexity, affecting the total cost for consumers.

93.     The pricing of commercial HVAC Equipment is generally consistent across the various brands offered by Defendants, ranging from $5,000 to over $100,000, depending on the specific commercial application. For example, a small retail shop will likely require a much smaller system than a large warehouse. Additionally, prices for commercial HVAC Equipment vary based on factors such as efficiency ratings, size and capacity, and the type of system. Other installation factors, including labor and equipment costs, permit and inspection fees, design and engineering expenses, and ductwork contribute to the overall variability in cost.

94.     In the HVAC market, buyers have no real alternatives when their furnace or air conditioner fails; they must replace it regardless of cost. Consequently, demand remains steady even as prices increase. This situation, characterized by uniform pricing among competitors and captive demand, gives Defendants both the ability and motivation to coordinate their pricing strategies.

- 43 -

**Defendants Manufacture HVAC Equipment with Significant Overlap**

95.    All seven Defendant groups manufacture and sell HVAC Equipment across similar product categories, including: (1) Residential Air Conditioners (except AAON); (2) Residential Heat Pumps (except AAON); (3) Residential Furnaces (except AAON and Daikin); (4) Air Handlers; (5) Commercial Rooftop Units; (6) Commercial Split Systems; (7) VRF/VRV Systems (except AAON, Lennox, and Rheem); and (8) Chillers (except Lennox and Rheem).[39]

96.    Additionally, many Defendants promote these products using various brand names, which obscures the lack of competition and further amplifies the overlap.

---

[39]   AAON, Inc., Air Handling Units, https://www.aaon.com/products/air-handling-units#:~:text=Engineered%20for%20any%20application%20imaginable,air%20handling%20configurations%20are%20available (last visited Apr. 26, 2026); Bosch, *Heating & Cooling Systems*, https://www.bosch-homecomfort.com/us/en/ocs/residential/heating-and-cooling-systems-1098838-c/ (last visited Apr. 26, 2026); Carrier, *Heating and Air Conditioning Units*, https://www.carrier.com/residential/en/us/products/heating-cooling/ (last visited Apr. 26, 2026); Daikin Indus. Ltd., *Air Conditioning & Refrigeration*, https://www.daikin.com/products/ac (last visited Apr. 26, 2026); Lennox, *Our Product Lines*, https://www.lennox.com/residential/products/our-product-lines (last visited Apr. 26, 2026); Lennox, *Our Product Lines*, https://www.lennox.com/residential/products/our-product-lines (last visited Apr. 26, 2026); Rheem Mfg. Co., *home heating & cooling*, https://www.rheem.com/products/residential/heating-and-cooling/ (last visited Apr. 26, 2026); Trane, *Products*, https://www.trane.com/residential/en/products/ (last visited Apr. 26, 2026).

97.     AAON has AAON, BASX, Airtech Equipment. [40]

98.     Bosch has Bosch, Champion, Coleman, IVT, Luxaire, Hitachi, TempMaster, Gaurdian, Johnson Controls, JC RLC, and York.[41]

99.     Carrier has Carrier, Bryant, Toshiba, Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, ICP, Keeprite, Day & Night, and Viessmann.[42]

100.    Daikin has Daikin, Goodman, Quietflex, Amana, and Thermal-Netics. [43]

101.    Lennox has Allied, Armstrong Air, AirEase, Concord, Ducane, Allied Commercial, and MagicPak. [44]

---

[40] AAON, Inc., *Our Company*, https://www.aaon.com/about (last visited Apr. 26, 2026).

[41] Bosch, *Brands of the Bosch Home Comfort Group*, https://www.bosch-homecomfortgroup.com/en/brands/ (last visited Apr. 26, 2026).

[42] Carrier Glob. Corp., *Innovative solutions for a sustainable future*, https://www.carrier.com/us/en/our-brands/ (last visited Apr. 26, 2026).

[43] Daikin Indus. Ltd., *Our Story*, https://careers.daikincomfort.com/about/our-story# (last visited Apr. 26, 2026).

[44] Allied, *Legacy of Service*, https://www.alliedair.com/about/#:~:text=Allied%20Air%20is%20a%20Lennox%20International%20company.,ultimate%20source%20for%20heating%20and%20cooling%20solutions (last visited Apr. 26, 2026).

102. Rheem has Rheem, Ruud, Friedrich, Russell, Kramer, Witt, ColdZone, SureComfort, and WeatherKing. [45]

103. Trane has Trane, American Standard, RunTru, Ameristar, OxBox, StellarEnergy, and Mitsubishi Electric. [46]

104. When homeowners or contractors compare quotes from various brands, they may not realize that many of these products come from the same limited pool of manufacturers. Having this knowledge can empower buyers to make informed decisions and seek out the best value.

**The HVAC Equipment Conspiracy**

105. Before January 2020, HVAC Equipment prices moved in step with the broader economy. That alignment had held for years. It broke in January 2020, when Defendants launched the first in a series of coordinated price increases. The COVID-19 pandemic, which arrived weeks later, gave them both the opportunity and cover to ramp up their price increases.

---

[45] Rheem Mfg. Co., *Every breakthrough, every innovation designed to be a part of everyday life*, https://www.rheem.com/about/#brands (last visited Apr. 26, 2026).

[46] Trane Technologies, *Our brands bring sustainable, efficient climate solutions to buildings, homes & transportation*, https://www.tranetechnologies.com/en/index/brands.html#:~:text=Together%2C%20Trane%C2%AE%2C%20Stellar%20Energy%2C%20and%20LiquidStack%C2%AE%20are,and%20assembled%20right%20here%20in%20the%20U.S.A   (last visited Apr. 26, 2026).

- 46 -

106.   Between mid-November and mid-December 2019, four Defendant groups announced price increases for early 2020, all in the range of 3% to 6%, all announced in ACHR News. Each announcement was public, each fell within a narrow band, and each was made through the same trade publication.

107.   Weeks after those announcements, Defendants' senior executives gathered in Orlando, Florida for AHRI's annual meeting. The attendees included AHRI's Vice Chairman, Mike Schartz, Chief Executive Officer ("CEO") of Daikin Applied Air, as well as Board members Gary Bedard, Executive Vice President ("EVP"), President, and Chief Operations Officer Worldwide Refrigeration at Lennox; Branson, President at Rheem; Elizabeth Haggerty, Vice President and General Manager Global Ducted Systems at Johnson Controls (Bosch); Chris Nelson, President Residential and Commercial Systems at Carrier; and Donny Simmons, President Commercial HVAC at Ingersoll Rand Inc. (then Trane's parent). Upon information and belief, ACHR News staff attended the AHRI conference and provided coverage of all AHRI and other industry conferences.

108.   Shortly thereafter, the COVID-19 pandemic disrupted supply chains across every sector of the economy. Defendants used the new expectation of price increases to push through increases far larger than their actual cost increases warranted, knowing that buyers would attribute the higher prices to the pandemic rather than to coordination.

- 47 -

109. Defendants began announcing price increases in rapid succession, each one through ACHR News. Each was disseminated through the same trade publication. Each cited the same generalized cost justifications. And, the percentages clustered in the same narrow range. What Defendants did not do was compete for market share by holding prices steady while a competitor raised them.

110. In December 2020, Congress enacted the American Innovation and Manufacturing ("AIM") Act, mandating the phasedown of hydrofluorocarbons ("HFCs"). This prohibition covered R-410A refrigerant, the primary refrigerant used in air conditioning condensers and heat pumps. The prohibition would not take effect until January 1, 2025, five years later, but Defendants began citing the transition as justification for price increases almost immediately, adding it to the growing list of pretexts alongside the COVID-19 pandemic-related cost pressures.

111. The pace of price increases accelerated sharply in 2021. In March 2021 and April 2021 alone, five Defendant groups announced price increases on overlapping timelines. Within six weeks, every major manufacturer had raised prices, and each one pointed to the same input cost pressures to explain it.

112. By the summer of 2021, the increases were larger and the follow-on times shorter. Defendants were no longer merely tracking each other. They were raising prices in tandem, at nearly identical percentages, within days of one another.

- 48 -

113. The final quarter of 2021 brought the largest increases yet. Lennox announced a 13% increase on commercial equipment in October 2021, the single largest published increase to that point. Carrier followed within days at up to a 12% increase on commercial and a 10% increase on residential equipment. Lennox matched its own commercial number on the residential side, announcing a 13% increase on residential equipment in early November 2021. Allied Air (Lennox) added a 12% increase. Trane closed the year with up to a 12% increase on both residential and commercial equipment, splitting the effective dates across January 2022. Meanwhile, AAON announced its fourth price increase in 12 months, and both Daikin and Rheem's HTPG subsidiary raised commercial prices. By the end of 2021, Defendants had collectively imposed multiple rounds of increases totaling well above 20% each on most product lines, a pace of escalation without precedent in the HVAC Equipment industry. As Carrier's CFO, Patrick Goris ("Goris"), said in November 2021: "it's our intention to capture pricing and retain that pricing. I would say that we've seen. . . all of our competitors raise prices as well . . . . But so clearly, we've seen discipline in the market."[47]

---

[47] Carrier Glob. Corp., *Deutsche Bank Industrials Conference Transcript* (Nov. 17, 2021), https://s205.q4cdn.com/164393362/files/doc_events/2021/11/CARR-US-20211117-2586149-C.pdf.

114. Across 2021, Defendants announced more than 20 separate price increases on HVAC Equipment. Not one Defendant responded to a competitor's price increase by holding its own prices steady to compete for market share. Instead, each increase was met with a matching or larger increase from one or more competitors within days or weeks. The consistency of this pattern, across supposedly independent companies selling to thousands of customers nationwide, is not explained by parallel responses to common cost pressures. It is explained by a conspiracy among Defendants.

115. Spring 2022 brought even more coordination on price increases. AAON announced a 7% increase on commercial equipment on March 2, 2022. A few days later, Carrier announced up to a 9% increase on commercial equipment.

116. Commenting on industry price increases on March 15, 2022, Carrier's CFO, Goris, trumpeted the fact that "generally, the industry has been able so far to pass on pricing."

117. On March 28, 2022, Lennox matched at exactly 9%. On April 4, 2022, Trane matched at exactly 9%. On April 18, 2022, Rheem's Russell HTPG matched at exactly a 9% increase, effective on May 1, 2022, the exact same day as Trane's price increase. On April 18, 2022, Allied Air (Lennox) also matched at a 9% increase.

118.   Four of the seven Defendants announced substantially similar price increases within three weeks of each other, with a fifth a month later. The probability that five independent companies would independently increase their prices at the same percentage (as opposed to using their competitors' price information to compete against them and reap additional profits at their expense) and announce it within weeks through the same trade publication, is not just unlikely, but economically irrational and can only be explained by illegal coordination.

119.   Summer 2022 brought a second wave with even larger increases. Daikin led on May 10, 2022, with up to a 12% increase on commercial equipment. One week later, Trane announced up to an 18% increase. Carrier followed on May 26, 2022, with up to a 12% increase. Lennox announced up to a 14% increase in June 2022, and Allied Air (Lennox) matched at a 14% increase a month later. Daikin and Trane each announced additional commercial increases in late July 2022 and September 2022, at 5% and 3%-6% respectively.

120.   2022 ended as it began, with another round of matched increases. Carrier announced up to an 8% increase in mid-November. Lennox announced up to an 8% increase on December 5, 2022. Allied Air (Lennox) matched at an 8% increase four days later, on December 9, 2022. Trane announced up to a 10% increase that same day. Once again, the percentages clustered within a tight band,

the announcements came within days of each other, and each one was published through ACHR News.

121. By the end of 2022, the cumulative effect of Defendants' coordinated increases since January 2020 was staggering. The HVAC PPI had climbed approximately 40% in three years. Defendants' profit margins expanded to levels the industry had never seen. And, not once during the year did any Defendant respond to a competitor's price increase by holding or lowering its own prices to gain market share. The pattern was clear: every increase was met with a price match or a further re-raise, but never with competition that might drive prices down.

122. By 2023, the raw material cost pressures Defendants had cited to justify three years of price increases were easing. Steel, copper, and aluminum prices had retreated from their 2022 peaks. But, Defendants' prices did not follow. During Trane's and Carrier's February 2023 earnings calls, they delivered nearly identical messages to investors. Trane reported that "strong volume growth, positive price realization and productivity more than offset material and other inflation."[48] Carrier

---

[48] Trane Technologies, Press Release, *Trane Technologies Reports Strong Fourth-Quarter and Full-Year 2022 Results; Robust Backlog Provides Strong Visibility Entering 2023* (Feb. 2, 2023), https://investors.tranetechnologies.com/news-and-events/news-releases/news-release-details/2023/Trane-Technologies-Reports-Strong-Fourth-Quarter-and-Full-Year-2022-Results-Robust-Backlog-Provides-Strong-Visibility-Entering-2023/default.aspx.

- 52 -

echoed that "strong price realization more than offset unprecedented inflation."[49] Both companies were telling the market the same thing: costs were no longer rising faster than prices. Defendants were making money on the spread and intended to keep doing so.

123. In April 2023, executives from Carrier, Daikin, Johnson Controls (Bosch), Mitsubishi Electric Trane HVAC US LLC, and Rheem attended the Air Conditioning Contractors of America (ACCA) Conference and Expo in New Orleans, Louisiana providing another opportunity for direct interaction.

124. In July 2023, Lennox CEO Maskara told investors: "Regarding price versus inflation, we are pleased to report that the industry pricing remains disciplined and our own mid-year price increase has been broadly successful."[50] He continued: "We expect the second half of the year to deliver a positive price versus inflation spread."[51] Maskara was not describing competition. He was describing coordination. A "positive price versus inflation spread" means prices are rising faster than costs, and "disciplined" industry pricing means no competitor is undercutting to capture

---

[49] PR Newswire, *Carrier Reports Strong 2022 Results & Announces 2023 Outlook* (Feb. 7, 2023), https://www.prnewswire.com/news-releases/carrier-reports-strong-2022-results-and-announces-2023-outlook-301740566.html.

[50] Lennox Int'l, Inc., *Q2 2023 Earnings Call Transcript* (July 27, 2023), https://themarketscafe.com/lennox-international-inc-lii-q2-2023-earnings-call-transcript/.

[51] *Id.*

share. His comments echoed those of Carrier's CEO David Gitlin ("Gitlin"), who stated on March 15, 2023, that Carrier had "really leaned into making sure that we have the pricing discipline."[52]

125.   The fall brought another coordinated round. Bosch raised heat pump prices in August. Trane announced 2%-6% increases on commercial equipment in September. Lennox followed with up to an 8% increase on commercial equipment in October. Carrier matched at an 8% increase on commercial equipment in November 2023. Trane then announced up to a 5% increase on residential equipment, and Lennox followed within two weeks with up to a 10% increase on residential equipment. Allied Air (Lennox) closed the year with up to a 10% increase on residential and a 12% increase on commercial equipment, effective January 2, 2024. Bosch subsidiaries Coleman and Evcon implemented 8% increases effective December 31, 2023. By now, the annual cycle was entrenched: fall announcements for increases taking effect in January, each Defendant waiting just long enough after a competitor's announcement to maintain the appearance of independent decision-making but never long enough that the pattern could be mistaken for anything but coordination.

---

[52]  Carrier Glob. Corp., *J.P. Morgan Industrials Conference Transcript* (Mar. 15, 2023), https://s205.q4cdn.com/164393362/files/doc_events/2023/03/CARR-US-20230315-2798682-C.pdf.

126. The annual cycle repeated. Carrier opened 2024 with a January announcement of 6%-10% increases across all products, specifying that residential would rise 6%, light commercial would rise 8%, and would rise commercial 10%. Bosch raised heat pump prices 6% effective January 12, 2024. Nortek Global HVAC (soon to be acquired by Rheem) announced up to an 8% increase on residential equipment in late January. Trane followed with 2%-6% increases on commercial equipment effective February 10, 2024. Daikin raised residential prices up to 7% effective February 1, 2024, and raised commercial prices 8%-10% effective April 1, 2024. Trane closed the year with a commercial increase effective January 2025, most increases falling between 2% and 5%. Over the course of the year (2024), Rheem raised prices 8%-15% through a series of public announcements.

127. Meanwhile, the market consolidated further. Carrier acquired Viessmann Climate Solutions in January 2024. Bosch announced it had reached a deal to purchase Johnson Controls' HVAC business in July 2024. Rheem completed its acquisition of Nortek Global HVAC in October 2024, absorbing the Frigidaire, Maytag, Miller, and Broan brand lines. Fewer competitors meant fewer potential defectors from the pricing arrangement. In September 2025, Lennox's CFO observed what the numbers confirmed: "shares don't shift a lot in our industry."[53]

---

[53] Investing.com, *Lennox at Morgan Stanley Conference: Strategic Growth Amid Market Challenges* (Sep. 11, 2025),

128.   2025 opened with another cascade of price hikes. Allied Air (Lennox) announced a 5% increase on residential parts and commercial equipment effective January 13. Trane announced a 10% increase on residential equipment effective February 1. Daikin announced 8%-10% increases on all residential and commercial equipment, with its Goodman and Amana subsidiaries issuing identical announcements the same day. Carrier raised residential prices 6%, light commercial prices 8%, and commercial prices 10% effective March 1, 2025. AAON imposed a 6% surcharge effective March 31, 2025. In April 2025, Rheem, Lennox, Daikin, and Bosch all announced increases ranging from 2% to 10%, with most taking effect on or around April 1, 2025. Six Defendant groups raised prices within a single quarter, all through public announcements, all within a narrow band.

129.   Carrier spoke in May 2025 of supporting these price increases with reductions in its inventory levels.

130.   In September, senior executives from Carrier, Lennox, and Trane gathered at the 13th Annual Morgan Stanley Laguna Conference. Over the course of two days, they delivered a coordinated message to the market and to each other.

131.   Carrier went first. When asked whether price competition might emerge in the residential market, CFO Goris dismissed the possibility, noting that "the

---

https://www.investing.com/news/transcripts/earnings-call-transcript-accesso-technologys-q4-2025-earnings-beat-expectations-93CH-4637434.

combination of the price and the mix up is still double-digit positive."[54] Goris' comments followed CEO Gitlin's July 29, 2025 confirmation that Carrier was "going to consciously pull down inventory in the second half of the year" and work with its distributors, like Watsco, to ensure supply "balance" to support prices.[55]

132.  Lennox's CFO Quenzer spoke the next day. He praised the industry's pricing discipline, described the input cost pressures all Defendants faced and then told the room what would happen next: "I expect price and cost to continue to go up. I don't think inflation is going to stop here. I think the next level will be early next year when we all come out and announce our next full round of price increases. For the balance of the year, I think we're pretty well set from a price perspective. Next year, we'll do our annual price increase, and just like we always do, we expect similar results by others."[56]

---

[54] Carrier Glob. Corp., *Morgan Stanley Laguna Conference Transcript* (Sept. 10, 2025), https://s205.q4cdn.com/164393362/files/doc_events/2025/Sep/10/CORRECTED-TRANSCRIPT_-Carrier-Global-Corp-CARR-US-Morgan-Stanley-Laguna-Conference-10-September-2025-1_45-PM-ET.pdf.

[55] Carrier Glob. Corp., *Q2 2025 Earnings Call Transcript* (Jul. 29, 2025), https://s205.q4cdn.com/164393362/files/doc_events/2025/Jul/29/CORRECTED-TRANSCRIPT_-Carrier-Global-Corp-CARR-US-Q2-2025-Earnings-Call-29-July-2025-7_30-AM-ET.pdf.

[56] *Lennox at Morgan Stanley Conference: Strategic Growth Amid Market Challenges*, *supra* note 53.

133. Trane's CEO Dave Regnery ("Regnery") and CFO Chris Kuehn ("Kuehn") also spoke that day.

134. Regnery revealed that Trane had restricted supply, consistent with Carrier's and Lennox's call for discipline: "We have taken some time out of our factory so that we can balance the inventory load within the channel."[57]

135. Three companies. Two days. Each one publicly confirming its commitment to higher prices and its expectation that competitors would do the same. Quenzer's statement that "we expect similar results by others" was not a prediction. It was an assurance.

136. Trane raised commercial prices in late September 2025, with most increases at 1%-4%. Bosch closed the year with increases across its heat pump, Coleman, and Evcon brands, ranging from 3% to 8% increases effective December 31, 2025.

137. In November 2025, Carrier's CFO, Goris, was asked about pricing pressure given declining volumes. He confirmed that "overall pricing was up double

---

[57] Investing.com, *Trane Technologies at Morgan Stanley's Laguna Conference: Strategic Resilience Amid Challenges* (Sep. 11, 2025), https://www.investing.com/news/transcripts/trane-technologies-at-morgan-stanleys-laguna-conference-strategic-resilience-amid-challenges-93CH-4236019.

digits year over year" and telegraphed an upcoming increase in the "mid-single-digit range," continuing the pattern of public price signaling.[58]

138.  In December 2025, Carrier's CEO Gitlin reiterated this point, acknowledging Carrier's position as an industry leader and publicly confirming Carrier's commitment to pricing discipline on a forward-looking basis:

> But, look, we have a disciplined market. We are the clear market leaders. And if you kind of look at a buying decision for a homeowner, to buy a $10,000 unit, if we move price on the product, forget the cost of the insulation, our products are relatively small percent. We move price a couple points, it's not going to swing the buying behavior of the ultimate customer.
>
> So where you get into pricing discussions is when you have people that are doing unnatural acts out in the industry that drive a behavior that takes hold, that drives pricing down for the entire industry. And we believe, as market leaders, that we – it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year.[59]

139.  It is only in a cartel setting that competitor price competition is seen by a market leader as an "unnatural act." In a competitive market, aggressive pricing

---

[58]  Investing.com, *Carrier Global at Baird Conference: Strategic Amid Challenges* (Nov. 12, 2025), https://www.investing.com/news/transcripts/carrier-global-at-baird-conference-strategic-focus-amid-challenges-93CH-4352604.

[59]  Carrier Glob. Corp., *Goldman Sachs Industrials & Auto Week Transcript* (Dec. 4, 2025), https://s205.q4cdn.com/164393362/files/doc_events/2025/Dec/04/2025-12-04-CARR-Goldman-Sachs-Industrials-Auto-Week-CORRECTED-Transcript.pdf.

wins customers and shifts market share. Stable shares in the face of years of supracompetitive pricing is a hallmark of a functioning cartel.

140. Effective January 1, 2026, Lennox increased commercial HVAC Equipment prices by up to 5%.

141. During Trane's January 29, 2026 earnings call, EVP and CFO, Kuehn, revealed that Trane "reduced factory production days by one-third" to "normalize residential inventory." He explained that prices had not decreased because of decisions by Trane and its competitors to keep supply short of demand: "[W]e've not seen pricing fade in the business. I think about the fourth quarter and pricing, it really is more due to volume being lower than anything else." Then Kuehn reassured Trane's competitors that Trane would not cut prices: "I don't want anyone to think that pricing is coming down in that market."[60]

142. The next day, ACHR News reported that Lennox CEO "Maskara reinforced that pricing discipline remains consistent across the industry." Maskara affirmed Lennox's commitment to the price increases it observed from competitors:

---

[60] Motley Fool, *Trane (TT) Q4 2025 Earnings Call Transcript* (Jan. 29, 2026), https://www.fool.com/earnings/call-transcripts/2026/01/29/trane-tt-q4-2025-earnings-call-transcript/.

"Based on everything we have seen so far, we see our competitors aiming at similar price increases."[61]

143.   Effective February 16, 2026, Lennox increased residential HVAC Equipment prices by up to 10%.

144.   Then came the Barclays 43rd Annual Industrial Select Conference held February 17-19, 2026, in Miami, Florida. In a two-day span, executives from Lennox, Trane, and Carrier appeared at the same conference and continued to overtly and publicly signal to each other.

145.   On February 17, 2026, Lennox's CFO Quenzer went first. Asked about residential pricing, he confessed:

> The industry's generally been disciplined for the past several years. We've had cost inputs coming into our business. Others have as well, and we're gonna continue to increase our pricing to maintain our margins. I think others have generally been as well. You know, we, as an industry, have realized that, you know, pricing, you know, taking it away, does not win market share.[62]

---

[61] Joanna Turpin, *Lennox Is Cautiously Optimistic About 2026, Predicts 6-7% Growth*, The News, https://digital.bnpmedia.com/article/Lennox+Is+Cautiously+Optimistic+About+20 26%2C+Predicts+6-7%25+Growth/5111122/860824/article.html.

[62] Investing.com, *Lennox at Barclays Conference: Strategic Growth Amid Challenges* (Feb. 17, 2026), https://www.investing.com/news/transcripts/lennox-at-barclays-conference-strategic-growth-amid-challenges-93CH-4509592.

146. He also announced that Lennox would restrict production to support the pricing structure: "[W]hat we're gonna do is reduce some production in the first quarter, keep our inventories flat."[63]

147. Trane's CFO Kuehn presented the same day, emphasizing the 5% increase Trane had announced days earlier (matching Lennox), "effective April 1." He attributed Trane's ability to raise prices to the fact that "the industry has been very disciplined in that regard over many years."[64]

148. At the same conference, Carrier's Chairman and CEO, Gitlin, mentioned Carrier's matching 5% increase: "If you look at our residential businesses in terms of realization rates . . . . In the Americas, we have 5% price that we've announced comes into place next month."[65] Gitlin, commenting on those price increases, stated further, "it only makes sense to raise prices . . . . And I think our competitors seem to be rational and in the same boat."[66]

---

[63] *Id.*

[64] Trane Technologies, *Barclays Industrial Select Conference Transcript* (Feb. 17, 2026), https://s2.q4cdn.com/950394465/files/doc_events/2026/Feb/17/Barclays-Conference-Transcript-2026.pdf.

[65] Carrier Glob. Corp., *Barclays 43rd Annual Industrial Select Conference Transcript* (Feb. 19, 2026), https://s205.q4cdn.com/164393362/files/doc_events/2026/Feb/19/2026-02-19-CARR-Barclays-Industrial-Select-Conference-CORRECTED-TRANSCRIPT.pdf.

[66] *Id.*

149.  Defendants used the word "discipline" or "disciplined" at the conference to describe the same pricing behavior. This makes no sense in the context of supposed independent decision-making by competitors responding to common market conditions. Rather, this was a public confirmation of a private understanding and yet another example of the iterative cooperation between Defendants.

150.  The increases continued into March 2026. Daikin raised light commercial and commercial prices up to 7% and other equipment 3.5%-5% on March 2, 2026. The same day, Daikin's Amana and Goodman brands announced up to a 7% increase, and Carrier's Viessmann and ICP/Heil/Tempstar subsidiaries increased prices 3%-5% and 4%, respectively. Allied Air (Lennox) matched Daikin's 7% increase effective March 16, 2026.

151.  Tellingly, on April 1, 2026, after news of the illegal scheme began to spread, ACHR News broke news of the first HVAC Equipment price decrease in years.[67]

## ECONOMIC EVIDENCE OF THE CONSPIRACY

### Defendants' Profit Margins Reached Unprecedented Levels During the Class Period

152.  Since the beginning of the Class Period, each Defendant family has publicly reported expanding – and in most cases *record-breaking* – profit margins,

---

[67] Dylan Kurt, *HVAC Price Increase List*, ACHR News (Apr. 2026), https://www.achrnews.com/articles/166018-hvac-price-increase-list-april-2026.

even as the rationales Defendants offered for raising prices (supply chain disruption, component inflation, and regulatory transitions) were purportedly squeezing the industry. The pattern is not consistent with a competitive market absorbing cost shocks; it is consistent with coordinated conduct in which Defendants raised prices in lockstep and captured the spread.

153. **Lennox**. Independent equity research has characterized Lennox's margin trajectory as remarkable, documenting that Lennox's adjusted operating margin climbed from approximately 8% during the 2007 sales peak to nearly 18% in 2023 and to over 19% in 2024.[68]

154. Lennox itself reported that for full-year 2025, its Building Climate Solutions segment profit margin expanded 60 basis points year-over-year to 23.4%, and that the company as a whole achieved segment profit margins of 20.4% – the first time in Lennox's history that it delivered annual margins above 20% – even as full-year revenue declined 3% and fourth-quarter revenue fell 11% on unfavorable

---

[68]   Brian Bernard, *HVAC Industry Shift to New Refrigerants Has Boosted Lennox's Profits*, Morningstar (July 23, 2025), https://www.morningstar.com/company-reports/1313806-hvac-industry-shift-to-new-refrigerants-has-boosted-lennoxs-profits (documenting Lennox adjusted operating margins rising from approximately 8% in 2007 to over 19% in 2024); Brian Bernard *Lennox Continues to Deliver Impressive Margin Expansion*, Morningstar (July 25, 2024), https://www.morningstar.com/company-reports/1234366-lennox-continues-to-deliver-impressive-margin-expansion (documenting adjusted operating margins of nearly 18% in 2023).

sales volumes. Lennox, thus, achieved its highest-ever margins during a period when demand was contracting.[69]

155.   **Trane**. On its January 29, 2026 earnings release announcing fourth-quarter and full-year 2025 results, Trane reported that revenues nearly doubled from approximately $12 billion in 2020 to $21.3 billion in 2025 – a compound annual growth rate of approximately 11%. Over the same period, Trane's adjusted earnings per share grew at a compound annual growth rate of approximately 24%, and adjusted earnings before interest, taxes, depreciation, and amortization (EBITDA) margin expanded by approximately 470 basis points to 20.1% in 2025.[70]

156.   These growth rates materially exceed input-cost inflation over the Class Period and cannot be reconciled with a competitive pricing environment.

---

[69]   Lennox Int'l Inc., Press Release, *Lennox Reports Fourth Quarter and Full Year 2025 Results; Provides Full Year 2026 Guidance* (Jan. 28, 2026), https://investor.lennox.com/news-releases/news-release-details/lennox-reports-fourth-quarter-and-full-year-2025-results.

[70]   Trane Technologies, Press Release, *Trane Technologies Reports Strong Fourth-Quarter and Full-Year 2025 Results; Robust Bookings and Backlog Provide Strong Visibility Entering 2026* (Jan. 29, 2026), https://investors.tranetechnologies.com/news-and-events/news-releases/news-release-details/2026/Trane-Technologies-Reports-Strong-Fourth-Quarter-and-Full-Year-2025-Results-Robust-Bookings-and-Backlog-Provide-Strong-Visibility-Entering-2026/default.aspx; Trane Technologies plc, Annual Report (Form 10-K) for the fiscal year ended December 31, 2020, https://www.sec.gov/Archives/edgar/data/1466258/000146625821000027/tt-20201231.htm (reporting total net revenues of $12,454.7 million).

157. **Carrier**. Carrier experienced comparable margin expansion. For full-year 2024, Carrier reported adjusted earnings per share growth of 16% and net sales of $22.5 billion. For full-year 2025, it reported adjusted operating margin of 15.1%. In the first quarter of 2025, Carrier's adjusted operating margin expanded 210 basis points while organic sales growth was only up 2%, with adjusted earnings per share up 27% – a combination that, as with Lennox, is consistent with price realization outpacing cost growth rather than volume-driven operating leverage.[71]

158. **Daikin**. Daikin reported in its May 8, 2025 full year 2024 results presentation that it had achieved "record highs in net sales and operating profit," notwithstanding industry headwinds. In subsequent quarterly presentations beginning August 5, 2025, Daikin acknowledged that "Industry demand for Residential remained stagnant" in the Americas – confirming that Daikin's record

---

[71] Carrier Glob. Corp., Press Release, *Carrier Reports Strong 2024 Results and Announces 2025 Outlook* (Feb. 11, 2025) (Form 8-K, Ex. 99), https://www.sec.gov/Archives/edgar/data/0001783180/000178318025000006/a8-kerexhibit99xq42024.htm; Carrier Glob. Corp., Press Release, *Carrier Reports 2025 Results and Announces 2026 Outlook* (Feb. 5, 2026) (Form 8-K, Ex. 99), https://www.sec.gov/Archives/edgar/data/0001783180/000178318026000005/a8-kerexhibit99xq42025.htm; Carrier Glob. Corp., Press Release, *Carrier Reports Strong First Quarter 2025 Results* (May 1, 2025) (Form 8-K, Ex. 99.1), https://www.sec.gov/Archives/edgar/data/0001783180/000178318025000028/a991-q12025earningsexhibit.htm.

financial performance was achieved despite, not because of, underlying market demand.[72]

159. **AAON**. AAON's own public disclosures are equally revealing. In its first quarter 2023 Form 8-K dated May 4, 2023, AAON reported that its "[g]ross profit margin in the quarter increased to 29.0%, up 380 basis points from the comparable quarter in 2022," and explained that "[p]rice increases implemented over the last year combined with moderating cost inflation were the driving factors to the gross profit margin expansion." AAON further disclosed that pricing comprised 22.0% of its year-over-year growth – nearly half of its 45.5% net-sales increase in the quarter – confirming that price realization, not volume leverage, was the dominant driver of AAON's reported results.[73]

160. By the third quarter of 2023, AAON's gross margin had expanded further to 37.2%. By the first quarter of 2024, AAON's gross margin was 35.2%, up

---

[72] Daikin Indus., Ltd., *Presentation of Financial Results for FY2024* (May 8, 2025), https://www.daikin.com/-/media/Project/Daikin/daikin_com/investor/data/kessan/20250508/presentation_2-pdf.; Daikin Indus., Ltd., *Presentation of Financial Results for the First Quarter Ended in June 2025*, at 11 (Aug. 5, 2025), https://www.daikin.com/-/media/Project/Daikin/daikin_com/investor/data/kessan/20250805/presentation2-pdf.

[73] AAON, Inc., Press Release, *AAON Reports Record Sales & Backlog for the First Quarter of 2023* (May 4, 2023), https://investors.aaon.com/investor-news/aaon-reports-record-sales-backlog.

from 29% in the comparable quarter in 2023, even as total sales volume declined 5.7%. AAON expressly attributed the margin expansion to "more favorable pricing relative to moderating cost inflation." AAON, thus, acknowledged in U. S. Securities and Exchange Commission ("SEC) filings what other Defendants' internal documents, upon discovery, are expected to confirm: Defendants were simultaneously raising prices and benefiting from moderating input costs, and they were keeping the resulting spread rather than competing it away.[74]

161. The simultaneity and magnitude of these margin improvements – across Defendants spanning different product mixes, geographies, and cost structures, and during a stretch when federal data show HVAC Equipment producer prices diverging from general appliance inflation – constitute powerful economic evidence of supracompetitive pricing achieved through coordination.

**Market Conditions Enabled and Sustained the Conspiracy**

162. Economists, antitrust enforcers, and federal courts have long recognized that certain market structures render coordinated pricing feasible and stable, while other market structures make such coordination practically impossible.

---

[74] AAON, Inc., Press Release, *AAON Reports Third Quarter of 2023 Results* (Nov. 6, 2023), https://investors.aaon.com/investor-news/aaon-reports-third-quarter-of-2023-results; AAON, Inc., Press Release, *AAON Reports First Quarter of 2024 Results* (May 2, 2024), https://investors.aaon.com/investor-news/aaon-reports-first-quarter-of-2024-results.

The HVAC Equipment market possesses every characteristic that the United States Department of Justice ("DOJ") and the Federal Trade Commission identify as conducive to collusion.

**The HVAC Equipment Industry Is Highly Concentrated**

163.   Concentrated markets facilitate coordination. As the DOJ's Antitrust Division has recognized, "[c]ollusion is more likely to occur if there are few sellers"; the fewer sellers there are, the easier it is for them to reach – and police – an agreement on prices, bids, customers, or territories. Collusion also becomes feasible when a small group of major sellers account for most of the market and the remaining firms are "fringe" sellers who control only a small fraction.[75]

164.   The HVAC Equipment market meets this description. Seven Defendant families – Carrier, Trane, Lennox, Daikin, Rheem, Bosch (including its recently acquired Johnson Controls Residential and Light Commercial HVAC business), and AAON – together accounted for approximately 90% of U.S. HVAC Equipment sales throughout the Class Period, with the remaining fraction divided among much smaller fringe participants.[76]

---

[75] U.S. Dept. of Justice, Antitrust Div., *Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects*, https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding (last visited Apr. 26, 2026).

[76] *See North American HVAC Equipment Market, by Manufacturer, and by Market Share*, *supra* note 28 (reporting 2020 market shares of Trane (22.8%), Lennox

165.   The market became materially more concentrated during the Class Period through a series of transformative acquisitions. On January 2, 2024, Carrier completed its €12 billion acquisition of Viessmann Climate Solutions, adding a premier European heat-pump manufacturer to Carrier's portfolio.[77]

166.   On October 7, 2024, Rheem completed its acquisition of Nortek Global HVAC, bringing the Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and Partner's Choice brand lines under Rheem's Global Air division.[78]

167.   On July 31, 2025, Bosch completed its $8.1 billion acquisition of Johnson Controls' Residential and Light Commercial HVAC business – the largest acquisition in Bosch's 139-year history – together with 100% of the Johnson Controls–Hitachi Air Conditioning joint venture, adding approximately 12,000

---

(16.5%), Carrier (15.2%), Rheem (10.8%), York (7.6%) (now owned by Bosch), Amana (4.3%) and Goodman (4.2%) (both Daikin subsidiaries), American Standard (4.1%) (a Trane subsidiary), Daikin (3.2%), and AirEase (1.4%) (a Lennox subsidiary), which together total approximately 90% of the North American HVAC Equipment market when consolidated by parent company).

[77] Carrier Glob. Corp., Press Release, *Carrier Completes Acquisition of Viessmann Climate Solutions* (Jan. 2, 2024), https://www.corporate.carrier.com/news/news-articles/carrier-completes-acquisition-of-viessmann-climate-solutions.html (transaction valued at €12 billion).

[78] Rheem Mfg. Co., Press Release, *Rheem acquires nortek global hvac* (Oct. 9, 2024), https://www.rheem.com/about/news-releases/rheem%C2%AE-acquires-nortek-global-hvac/.

employees and two U.S. manufacturing facilities to the Bosch Home Comfort Group.[79]

168. Each of these transactions reduced the number of meaningful competitors in adjacent HVAC Equipment segments, increased the share of the market controlled by the remaining Defendant families, and made coordination easier to achieve and maintain. The consolidation also expanded the brand portfolios operated by each Defendant – a structural feature discussed below – which further reduced the apparent number of competitors direct purchasers perceived in the marketplace, even as the number of independent decision-makers shrank.

**The HVAC Equipment Industry Has High Barriers to Entry**

169. High barriers to entry protect coordinated pricing by insulating incumbents from new-entrant erosion. The HVAC Equipment industry presents formidable barriers. HVAC manufacturing facilities cost hundreds of millions of dollars to build and take years to bring online. Daikin's Texas Technology Park in Waller, Texas, for example, cost more than $417 million to construct, broke ground

---

[79] Johnson Controls Int'l plc, Press Release, *Johnson Controls completes sale of residential and light commercial HVAC business* (Aug. 1, 2025), https://www.johnsoncontrols.com/media-center/news/press-releases/2025/08/01/johnson-controls-completes-sale-of-residential-and-light-commercial-hvac-business; Robert Bosch GmbH, Press Release, *Bosch wants to grow significantly faster than the market in the heating, ventilation, and cooling sector* (Aug. 1, 2025), https://us.bosch-press.com/pressportal/us/en/press-release-28096.html.

in March 2015, and did not hold its grand opening until May 2017 – more than two years of construction to bring a single plant online. Today, the facility occupies a 500-acre campus, includes a 4.2 million-square-foot building (the second-largest manufacturing facility in North America), and consolidates Daikin's U.S. residential and light-commercial ducted and ductless unitary operations under a single roof, employing approximately 5,000 workers.[80]

170.   New entrants must also develop engineering capabilities sufficient to meet AHRI-certified performance ratings, UL safety certifications, Department of Energy minimum-efficiency standards, and U.S. Environmental Protection Agency ("EPA") refrigerant regulations – each of which carries its own multi-year compliance pathway. New entrants also face formidable brand loyalty. Each Defendant family operates brands with histories spanning a century or more –

---

[80] *See* Commercial Property Executive, *Daikin Brings Cool $417M Campus to Houston* (May 31, 2017), https://www.commercialsearch.com/news/daikin-brings-cool-417m-campus-to-houston/; Texas Econ. Dev. Corp., *Daikin Success Story*, https://businessintexas.com/success-stories/daikin/ (reporting that the campus opened in 2017 after more than $500 million in construction costs and investments and occupies approximately 4.2 million square feet) (last visited Apr. 26, 2026); HTS, *Daikin Texas Technology Park*, https://www.hts.com/projects/daikin-texas-technology-park/ (last visited Apr. 26, 2026) (describing the Daikin Texas Technology Park as a manufacturing and logistics campus hosting over 5,000 employees); Daikin Texas Tech. Park, https://daikintexastechnologypark.com/ (last visited Apr. 26, 2026) (describing the consolidation of manufacturing, engineering, logistics, marketing, and sales for Goodman, Amana, and Daikin brand unitary heating and air conditioning products at the facility).

Lennox (founded in 1895), Carrier (founded in 1902), Trane (founded in 1913), Daikin (founded in 1924), and Rheem (founded in 1925) – and the Johnson Controls HVAC heritage brands such as York (founded in 1874). Contractors and distributors have long-standing commercial relationships with these brands that a new entrant would need to dislodge product-by-product, market-by-market.

171. Compounding this barrier, Defendants operate behind a crowded façade of house brands that mask the true concentration of the market. Carrier alone markets equipment under Carrier, Bryant, Day & Night, Heil, ICP, Keeprite, Payne, Tempstar, and multiple other nameplates. Trane sells under Trane and American Standard. Rheem markets under Rheem, Ruud, Friedrich, Raypak, Weather King, and now also Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and related NGH brands. Bosch, following its Johnson Controls acquisition, markets under Bosch, York, Champion, Coleman, Luxaire, Hitachi, TempMaster, Guardian, and others. A new entrant must, therefore, appear to distinguish itself from an artificially large brand crowd in order to gain distribution and customer recognition – a task made more difficult by the fact that customers, distributors, and even contractors frequently perceive these sister brands as independent competitors.

**No Close Substitutes for HVAC Equipment Exist, and Demand Is Inelastic**

172. Nearly every home in the United States uses air-conditioning. It is equally ubiquitous in commercial buildings.

173.   For almost every purchaser – homeowner, business, or landlord – HVAC Equipment is not merely a convenience but an indoor-climate necessity tied to health, safety, habitability, and, in many jurisdictions, legal compliance. No meaningful substitutes exist. Window units, space heaters, and portable air conditioners are inadequate substitutes for whole-building systems, and they themselves are dominated by the same manufacturing incumbents.

174.   The absence of substitutes yields inelastic demand. When HVAC Equipment fails – especially during peak summer or winter seasons – owners cannot realistically defer replacement. The equipment is embedded in ductwork, electrical, and refrigerant infrastructure; replacement is typically required within days, not months. The buyer's price sensitivity at the point of purchase is, therefore, low, giving sellers pricing power that a collusive agreement can exploit profitably.

**Defendants Acted Against Their Unilateral Economic Self-Interest**

175.   A firm acting unilaterally in a competitive market does not voluntarily cede market share by slashing output and inventory while demand persists; nor does it publicly broadcast price-increase intentions in advance; nor does it disclaim any desire to win share on price. A unilateral profit-maximizer does exactly the opposite of each of those things. Defendants, however, did each of those things – and their executives explained why, in plain English, using terminology that is rational only if Defendants had assurances, their competitors would not undercut them.

- 74 -

**Defendants Cut Production to Support Prices – in Public, at the Same Time, and to the Same Degree**

176. Most strikingly, the market leader – Trane – voluntarily slashed residential production by one-third. On Trane's January 29, 2026 fourth-quarter 2025 earnings call, Chairman and CEO Regnery acknowledged the action and explained its objective:

> [W]e were very, very intentional in the fourth quarter to get the inventory right. And you heard in our prepared remarks, we took a third of the production days out. So we knew that was going to cost us on the bottom line as we deleveraged over 60% in that particular business. But we also believe that we have inventory size right as we enter 2026.[81]

177. CFO Kuehn then returned to the same topic later in the call, explicitly reassuring the market – and by extension Trane's competitors – that the production cuts should not be misread as a prelude to price competition:

> I don't want anyone to think that pricing is coming down in that market. You know, the impact may be less than what we saw in 2025 with significant pricing, but we'll see.[82]

178. In a genuinely competitive market, a manufacturer with Trane's scale voluntarily reducing output by a third would invite rivals to seize the freed-up demand by expanding production and undercutting Trane on price. That is the textbook unilateral response. Trane's executives, however, spoke with confidence

---

[81] Trane Techs. plc, *Earnings Call: Q4 2025 Transcript* (Jan. 29, 2026), https://stockanalysis.com/stocks/tt/transcripts/398078-q4-2025/.

[82] *Id.*

that no such response would occur – and they were correct. No Defendant expanded output to capture Trane's ceded share. Instead, Lennox publicly committed to matching.

179.   At the Barclays 43rd Annual Industrial Select Conference on February 17, 2026 – less than three weeks after Trane's earnings call – Lennox CFO Quenzer announced that Lennox would pursue exactly the same strategy.

180.   Quenzer explicitly framed the approach as industry-wide discipline, not company-specific strategy, telling the same audience moments later that "the industry's generally been disciplined for the past several years"; that "we're gonna continue to increase our pricing to maintain our margins"; that "I think others have generally been as well"; and that "we, as an industry, have realized that . . . pricing, you know, taking it away, does not win market share."[83] This is not the language of unilateral competition. It is the language of a shared understanding – identified by Quenzer himself as industry-wide – that price-cutting "does not win market share," and, therefore, Defendants will not do it.

181.   Carrier had announced a parallel program months earlier. At Morgan Stanley's 13th Annual Laguna Conference held September 10, 2025 in Dana Point, California, Carrier Chairman and CEO Gitlin publicly committed that Carrier's own

---

[83]   *Id.*

distributor-level field inventory would be reduced by "$75 million to $100 million a month" in the third quarter of 2025, and that by year-end 2025 Carrier's field inventory would be "at levels that we really have not seen since before COVID" – specifically, "2017, 2018 levels." Gitlin described this as "very purposeful[]" action that Carrier was undertaking to drive inventory down to historic lows.[84]

182. In a genuinely competitive market, that public commitment would have been an invitation for Trane, Lennox, Rheem, and Daikin to fill Carrier's ceded volume at lower prices. None did. Instead, Trane announced one-third production-day cuts in January 2026, and Lennox announced matching production cuts in February 2026.

183. The temporal sequence – Carrier cutting inventory in the third quarter of 2025, Trane cutting production one-third in the fourth quarter of 2025, Lennox matching in the first quarter of 2026 – is the signature of coordinated output restriction, not independent optimization. Three market leaders do not independently arrive at synchronized supply reductions absent a shared understanding.

---

[84] Carrier Glob. Corp., *Presentation at Morgan Stanley's 13th Annual Laguna Conference* (Sep. 10, 2025) (remarks of Chairman & CEO Gitlin), https://www.investing.com/news/transcripts/carrier-global-at-morgan-stanley-strategic-moves-amid-market-challenges-93CH-4234249.

**Defendants Publicly Broadcast Price Increases in Advance**

184.   A firm acting unilaterally in a competitive market guards its pricing decisions as commercially sensitive information, disclosing them only as close to implementation as possible so that competitors cannot undercut the announced price. Defendants repeatedly did the opposite. Throughout the Class Period, Defendants announced specific price-increase percentages, product categories, and effective dates through ACHR News, distributor communications, and investor conferences – often weeks or months before implementation – providing competitors ample time to match rather than undercut.

185.   The timing of 2026 price announcements is illustrative. Trane announced a residential price increase of up to 5% effective January 1, 2026. Lennox followed with an announced residential price increase of up to 10% effective February 5, 2026 – consistent with Lennox's same-date price-increase cadence in each of the two preceding years. Carrier's CFO, Goris, publicly telegraphed at the November 2025 Baird Global Industrial Conference that Carrier would announce a 2026 residential price increase "in the mid-single-digit range," tracking the Trane figure, and Carrier ultimately raised 2026 residential prices by up to approximately 8%.[85]

---

[85]   *See* Joanna Turpin, *Soft Residential Demand Carries Into the New Year*, ACHR News (Jan. 5, 2026), https://www.achrnews.com/articles/165645-soft-residential-demand-carries-into-the-new-year (quoting Carrier CFO Goris at the November

186.   A firm acting competitively would have used a competitor's announced increase as an opportunity to hold price steady and capture share. Defendants did not. Each Defendant matched – and in several cases exceeded – the announced levels.

187.   This pattern is consistent only with an understanding that Defendants would follow each other's lead rather than compete against it. As Lennox CEO Maskara acknowledged during Lennox's January 28, 2026 fourth-quarter 2025 earnings call: "Based on everything we have seen so far, we see our competitors aiming at similar price increases."[86] A CEO cannot accurately report the price increases his competitors are "aiming at" unless that information has been signaled, shared, or otherwise coordinated. In a sealed-bid, arm's-length competitive market,

---

2025 Baird Global Industrial Conference: "Our intention is still to announce a price increase in residential in the Americas for 2026, likely in the mid-single-digit range."); Budget Heating & Air Conditioning Inc., *Upcoming Price Increases For Lennox 2026 Guide* (Dec. 17, 2025), https://www.budgetheating.com/blog/upcoming-price-increases-for-lennox-2026-guide/?srsltid=AfmBOor2_Iqnrqox-MGPd5wnVrlXiUKeM6BAYjaEkSH5aa_gz6q5Yh-H; Paschal Air, Plumbing & Electric, *2025 HVAC Price Increases by Brand* (Apr. 22, 2026), https://gopaschal.com/resources/2026-hvac-price-increases/ (chronicling industry-wide 2026 residential price-increase announcements by Trane, Lennox, and Carrier).

[86] Joanna R. Turpin, *Lennox Is Cautiously Optimistic About 2026*, ACHR News (Jan. 30, 2026), https://www.achrnews.com/articles/165750-lennox-is-cautiously-optimistic-about-2026 (reporting statements of Lennox CEO Maskara on company's Q4 2025 earnings call).

that information would not be available to competitors before implementation – and even then, only after, not before.

**Defendants' Executives Openly Disclaimed Price Competition**

188.   Most tellingly, Defendants' executives repeatedly told investors and industry participants – on the record, in SEC-filed materials, and at public conferences – that Defendants had abandoned price competition as a market-share strategy.

189.   Carrier CEO Gitlin, presenting at Morgan Stanley's 13th Annual Laguna Conference on September 10, 2025, opened his prepared remarks by describing Carrier's positioning in terms that emphasized its role as a market leader in concentrated verticals: "[W]e are market leaders in the right verticals and in the right geographies globally. Our vision and strategy are clear." Gitlin had returned repeatedly on earlier earnings calls to the theme that Carrier would maintain pricing discipline. On Carrier's fourth quarter 2024 earnings call on February 11, 2025, Gitlin told analysts that Carrier had consistently realized its announced price increases, explaining: "every year about what we thought we'd get in price, we've gotten in price," and confirmed Carrier's stated expectation that it would realize a

10% price increase on R-454B A2L refrigerant units in 2025, with pricing reaching "15 to 20 percent" over the following two years.[87]

190.   A Defendant acting unilaterally and in its own economic self-interest in a competitive market would leverage superior operational efficiency and lower input costs to win customers on price. Defendants instead leveraged their market position to raise prices and to encourage their rivals to do the same – conduct that is rational only if Defendants had reason to believe their rivals would reciprocate, *i.e.*, only in the presence of an agreement.

### Divergence Between HVAC Prices and Underlying Cost Drivers Confirms Supracompetitive Pricing

191.   The classic economic signature of coordinated pricing is a persistent divergence between output prices and input costs. Input costs for HVAC Equipment during the Class Period – steel, copper, aluminum, compressors, motors, electronics – rose substantially in 2020-2022, then moderated or declined in 2023-2024. A

---

[87]  Carrier Glob. Corp., *Morgan Stanley Laguna Conference*, *supra* note 54 (remarks of Chairman & CEO Gitlin); Carrier Global Corp., *Q4 2024 Earnings Call Transcript* (Feb. 11, 2025), https://s205.q4cdn.com/164393362/files/doc_financials/2024/q4/2025_02_11_-_CARR_-_Q4_2024_Earnings_Call_-_CORRECTED_TRANSCRIPT.pdf (remarks of Chairman & CEO Gitlin); Carrier Global Corp., *Q1 2024 Earnings Call Transcript* (Apr. 25, 2024), https://s205.q4cdn.com/164393362/files/doc_financials/2024/q1/2024_04_25_-_CARR_-_Q1_2024_Earnings_Call_-_CORRECTED_TRANSCRIPT.pdf (remarks of Chairman & CEO Gitlin).

competitive market would have seen HVAC Equipment prices track that cost curve: rising with inputs, then falling (or at least flattening) as inputs moderated.

192.   The U.S. Bureau of Labor Statistics' PPI for the Air-Conditioning, Refrigeration, and Forced Air Heating Equipment Manufacturing industry (BLS Series PCU333415333415) instead shows HVAC Equipment prices increasing continuously and steeply from 2020 through 2025, with no meaningful correction when input costs moderated. The industry-level HVAC Equipment PPI rose approximately 53% between January 2020 and December 2025, compared to roughly 26% for the general CPI and roughly 26% for the Household Appliance PPI over the same period. And, although the HVAC PPI reached an initial peak of 277.3 in June 2022 – concurrent with the height of input-cost inflation – the index continued to climb thereafter, reaching 311.9 by December 2025, an additional increase of over 12% from the input-cost peak. The Household Appliance PPI, by contrast, was essentially flat between the June 2022 peak and December 2024. The HVAC Equipment PPI, thus, diverged materially from both the general CPI and the Household Appliance PPI beginning in 2020 and has not reverted.[88]

---

[88] U.S. Bureau of Lab. Stat., Producer Price Industry Data: Air-conditioning, refrigeration, and forced air heating equipment mfg., https://data.bls.gov/timeseries/PCU333415333415 (last visited Apr. 26, 2026); *see also* Fed. Res. Bank of St. Louis, *Consumer Price Index for All Urban Consumers: All Items in U.S. City Average* (Mar. 2026), https://fred.stlouisfed.org/series/CPIAUCSL; Fed. Res. Bank of St. Louis, *Producer*

193. That is exactly what Defendants' executives themselves described: in the first quarter of 2023, AAON reported that its gross margin expanded 380 basis points because "[p]rice increases implemented over the last year combined with moderating cost inflation" – meaning costs were falling, and yet prices were still climbing. The only explanation consistent with a competitive market is implausible; the explanation consistent with a coordinated market is straightforward.

194. Because direct purchasers such as Plaintiff buy HVAC Equipment directly from Defendants, they absorb the overcharge first, at the point of sale, before any pass-through possibility downstream.

**The Economic Evidence, Taken Together, Supports the Plausibility of the Conspiracy**

195. No single economic indicator is, by itself, proof of the HVAC Equipment price fixing conspiracy. Together, however, the economic evidence summarized in this Section presents a pattern that courts and economists alike recognize as the hallmark of coordinated anticompetitive conduct:

(a) a highly concentrated market – seven firms, more than 90% combined share, and growing concentration through billion-dollar acquisitions;

---

*Price Index by Commodity: Furniture & Household Durables: Household Appliances* (Mar. 2026), https://fred.stlouisfed.org/series/WPU124.

(b)     high barriers to entry – multi-hundred-million-dollar facilities, multi-year ramp-up times, brand heritage spanning a century, and a crowded brand landscape that obscures true concentration;

(c)     a standardized product – standardized capacities, standardized efficiency ratings, and standardized performance certifications;

(d)     inelastic demand and no substitutes – HVAC Equipment is present in more than 95% of new homes and is required for commercial habitability;

(e)     parallel, unexplained, and near-simultaneous production cuts by three market leaders – Carrier, Trane, and Lennox – during late 2025 and early 2026, with each publicly acknowledging the cuts and publicly committing not to lower prices;

(f)     routine advance signaling of price increases through ACHR News and investor forums, with identical or near-identical matching by competitors;

(g)     executive statements openly describing industry-wide "discipline," disclaiming price competition, and affirming that competitors are "aiming at similar price increases";

(h)     persistent, unprecedented margin expansion across every Defendant – including record margins in quarters during which unit volumes declined – against a backdrop of moderating input costs; and

- 84 -

(i)    a sustained divergence between HVAC Equipment prices and both general inflation and input-cost indices.

196.    Each element corroborates the direct and circumstantial evidence of the conspiracy pleaded elsewhere in this Complaint. Together, they provide economic confirmation that Defendants' parallel conduct is not the product of rational independent decision-making in a competitive market. It is the product of an agreement to fix, raise, maintain, and stabilize the prices of HVAC Equipment – an agreement that has extracted billions of dollars in supracompetitive overcharges from Plaintiff and the Class.

## DEFENDANTS' FRAUDULENT CONCEALMENT

197.    Plaintiff and Class Members did not have actual or constructive knowledge of their claims because Defendants' fraudulently concealed the conspiracy. Defendants' means of effectuating the conspiracy, including price signaling, information sharing, production signaling, and in-person meetings, demonstrate that Defendants actively sought to prevent Plaintiff and Class Members from discovering the conspiracy. Plaintiff and Class Members lacked information that would have placed them on inquiry notice. Through the exercise of reasonable diligence, Plaintiff and the Class could not have discovered the alleged conspiracy until shortly before this filing.

198.  Defendants employed careful language, using terms like "discipline" and "price realization," and speaking of maintaining margins as a priority over competing for market share to conceal the conspiracy's existence, while simultaneously accomplishing its goals and reassuring co-conspirators of their continued commitment to the anticompetitive agreement. Examples include Lennox, Carrier, and Johnson Controls executives all mentioning their company's "discipline" when talking about pricing.

199.  Defendants also provided pretextual, non-conspiratorial explanations for HVAC Equipment price increases. These pretextual explanations were public and intended to mislead Plaintiff and Class Members to divert attention from the conspiracy.

200.  For example, Defendants initially blamed supply chain disruptions following the onset of the COVID-19 pandemic in March 2020 as justification for price increases during the Class Period. Beginning in 2025, Defendants shifted the blame to tariffs.

201.  Defendants also blamed two federal initiatives for HVAC Equipment price increases: the updated Seasonal Energy Efficiency Ratio 2 ("SEER2") energy efficiency standards and the phasedown of HFCs under the AIM Act.

202.  The new SEER2 energy conservation standards, which set minimum efficiency requirements for new HVAC Equipment sold beginning on January 1,

2023, were published in the Federal Register on January 6, 2017. Defendants, therefore, had at least six years to develop compliant equipment. Yet, Defendants still blamed the new standards for price increases.

203. Under the AIM Act, enacted on December 27, 2020, the EPA required the phase-out of R-410A refrigerant, prohibiting the manufacture and import of new air conditioning condensers and heat pumps using R-410A refrigerant beginning January 1, 2025. Yet, it was the HVAC Equipment industry that spearheaded the transition away from HFC refrigerants like R-410A, investing billions of dollars and spending more than a decade advocating for the change.

204. Plaintiff and Class Members had no ability to determine the accuracy of these pretextual explanations for price increases that Defendants communicated to the public.

205. Furthermore, Defendants state in publicly available codes of conduct and policy manuals that they complied with the antitrust laws, all while colluding to fix, raise, maintain, and stabilize the prices of HVAC Equipment at the expense of the Class.[89]

---

[89] Trane Techs. plc, *Our Code of Conduct*, https://www.tranetechnologies.com/content/dam/common/cs-coc/static/pdf/tt-code-of-conduct-en.pdf (2021) ("I uphold Trane Technologies' responsibility to compete fairly and never collude with outside parties by entering into improper agreements that could restrict or distort competition."); Lennox Int'l Inc., *Code of Business Conduct* (2024), https://www.lennox.com/application/themes/lennox/assets/pdf/Lennox%20COBC

206. Defendants' fraudulent concealment tolls the applicable statutes of limitations and equitably estops Defendants from asserting any statute of limitations defense.

---

%2009172024.pdf ("We conduct our business in accordance with all applicable antitrust, competition, and trade practice laws. We avoid even the appearance of unfairly restricting competition."); Carrier Glob. Corp., *Corporate Policy Manual: Section 5: Antitrust Compliance Program* (May 4, 2020), https://brandportal.carrier.com/m/486fd4157f865128/original/cpm-section-5-antitrust-compliance-program.pdf ("Every employee must learn and comply with Carrier antitrust policies and procedures to ensure strict compliance with all applicable antitrust laws."); Rheem Mfg. Co., *Supplier Code of Conduct* (Nov. 6, 2019), https://www.pndistribution.com/wp-content/uploads/2023/03/supplier-code-of-conduct.pdf ("Rheem suppliers must comply with all relevant and applicable laws and regulations"); Daikin Applied Ams. Inc., *Supplier Code of Conduct for the Americas* (Aug. 15, 2024), https://tahoeweb.daikinapplied.com/api/general/downloadDocument/media/21 ("Suppliers must refrain from forming cartels or engaging in anti-competitive arrangements or agreements, or concerted practices deliberately or incidentally designed to bypass, restrict, or distort competition as defined by applicable antitrust laws."); Robert Bosch GmbH, *Code of Conduct* (Sep. 2, 2024), https://assets.bosch.com/media/en/global/bosch_group/compliance/bosch-code-of-conduct.pdf ("We observe the rules of fair competition as particularly defined by antitrust laws. . . . [W]e do not reach agreements with our competitors on allocation of territories and customers, prices, and components of prices."); AAON, Inc., *Code of Business Conduct and Ethics* (last visited Apr. 29, 2026), https://investors.aaon.com/hubfs/Documents/IR%20Documents/Governance/AAONCodeOfEthics.pdf ("We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices.").

- 88 -

## CLASS ACTION ALLEGATIONS

207.   Plaintiff brings this lawsuit on behalf of itself and all other similarly situated entities and persons pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3)  as a representative of the Class, defined as follows:

> All entities and persons who directly purchased HVAC Equipment in the United States from at least as early as January 1, 2020 through the present from one or more of Defendants and their co-conspirators.

208.   The Class does not include: (a) Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant; (b) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any business majority-owned by any such person; (c) any co-conspirator identified in this action; and (d) any federal governmental entities.

209.   **Numerosity**. The Class is so numerous that joinder of all members in this lawsuit is impracticable. While Plaintiff is currently unaware of the precise number of Class Members, because the need for HVAC Equipment in the United States is persistent and constant, Plaintiff anticipates that there are at many thousands of direct purchasers of such Defendant-manufactured HVAC Equipment such that joinder is not possible.

210. **Typicality**. Plaintiff's claim is typical of those of the Class. Plaintiff and Class Members were all injured by the same unlawful conduct, which resulted in paying artificially inflated prices for HVAC Equipment sold in the United States than they otherwise would have in a normal, competitive market.

211. **Commonality and Predominance**. There are many questions of law and fact common to the Class, and these common questions will predominate over any individualized questions of individual Class Members. Questions of law and fact common to the Class include:

(a) whether Defendants entered into and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of HVAC Equipment;

(b) the identity of the participants in the conspiracy and the relationships among them;

(c) the duration, scope, and operation of the conspiracy, including the acts Defendants undertook in furtherance of it;

(d) whether Defendants exchanged competitively sensitive information, including pricing, production, or market data, in furtherance of the conspiracy;

(e) whether Defendants used trade associations, publications, or other mechanisms to signal pricing intentions and coordinate conduct;

(f)      whether Defendants implemented coordinated restrictions on production, inventory, or supply to support elevated prices;

(g)      whether Defendants' conduct suppressed, restrained, or eliminated price competition in the HVAC Equipment market;

(h)      whether Defendants' coordinated conduct caused HVAC Equipment prices to exceed competitive levels;

(i)      whether Defendants' conduct resulted in uniform price increases across the industry;

(j)      whether Defendants' conduct caused injury to the business or property of Plaintiff and the Class;

(k)      the effect of Defendants' conspiracy on HVAC Equipment prices in the United States during the Class Period;

(l)      whether Defendants concealed their unlawful conduct from Plaintiff and the Class; and

(m)      the amount of class-wide damages.

212.   **Adequacy**. Plaintiff is represented by counsel who is experienced and competent in the prosecution of complex antitrust and unfair competition class actions. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class.

213.   **Superiority**. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this lawsuit.

214.   Defendants have acted or refused to act on grounds that apply generally to Class Members such that final injunctive relief or corresponding declaratory relief is appropriate on a class-wide basis.

## ANTITRUST INJURY

215.   Defendants' anticompetitive conduct produced the following effects, among others:

(a)     Defendants reduced or eliminated price competition in the HVAC Equipment market;

(b)     Defendants fixed, raised, stabilized, or maintained HVAC Equipment prices at artificially inflated levels;

(c) Plaintiff and Class Members were deprived of free and open competition; and

(d) Plaintiff and Class Members paid, and continue to pay, illegally inflated prices for HVAC Equipment.

216. Plaintiff and Class Members purchased HVAC Equipment directly from Defendants during the Class Period. As a result, Defendants charged Plaintiff and Class Members supracompetitive prices at the point of sale, and the resulting overcharges are directly traceable from Defendants to Plaintiff and Class Members.

217. Defendants implemented their collusive scheme to fix, raise, stabilize, and maintain HVAC Equipment prices, and this conduct directly and foreseeably caused Plaintiff and the Class to pay prices above competitive levels.

218. Defendants' conduct caused injury to the business or property of Plaintiff and the Class by depriving them of the benefits of competitive market conditions and forcing them to pay inflated prices. Plaintiff and Class Members suffered antitrust injury in the form of overcharges, having paid more for HVAC Equipment than they would have paid absent Defendants' unlawful agreement and coordinated conduct.

219. There are common and widely accepted economic methodologies that can measure the magnitude and extent of these overcharges. These methods permit

damages calculations on a class-wide basis, quantifying the economic harm Plaintiff and Class Members suffered at Defendants' hands.

220. These injuries constitute antitrust injury of the type the federal antitrust laws aim to prevent and remedy.

221. Injunctive relief is necessary and appropriate because Defendants' ongoing conduct continues to distort the market and harm all Class Members. Only a Class-wide injunction can effectively prevent further injury.

**CLAIM FOR RELIEF**

**COUNT I**

**For Violation of the Sherman Antitrust Act of 1890, 1 U.S.C. §1**
**Against All Defendants**

222. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

223. Beginning in or around January 1, 2020, Defendants entered into an agreement to artificially inflate HVAC Equipment prices in the United States. This resulted in price competition being eliminated or reduced, creating an unlawful restraint of trade and commerce.

224. Throughout the Class Period, Defendants agreed and acted together to control the pricing of HVAC Equipment sold in the United States. Defendants carried out this coordinated conduct through a continuing arrangement and shared course of action designed to eliminate independent pricing decisions.

225.   This coordinated conduct caused HVAC Equipment prices to increase and remain above competitive levels for direct purchasers across the United States.

226.   Because of Defendants' conduct, Plaintiff and Class Members paid more for HVAC Equipment than they would have in a competitive market and lost the benefits of competition. These overcharges constitute injury to Plaintiff's and Class Members' business or property. These injuries represent the type of harm the antitrust laws seek to prevent.

227.   There are no procompetitive justifications for Defendants' agreement, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

228.   Defendants' price-fixing arrangements are unlawful under a per se mode of analysis.

229.   In the alternative, Defendants' price-fixing arrangements are unlawful under either a quick look or rule of reason mode of analysis.

230.   Plaintiff and the Class are entitled to recover treble damages, along with the costs and reasonable attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15. Plaintiff and the Class also seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. §26.

231.   Defendants' unlawful conduct has not ceased and continues to threaten additional harm. Without court intervention, Defendants will continue to coordinate

- 95 -

pricing practices and inflict ongoing injury onto Plaintiff and the Class. Therefore, Plaintiff and the Class request injunctive relief, including, but not limited to, orders:

(a) declaring Defendants' conduct unlawful under Section 1 of the Sherman Act;

(b) prohibiting Defendants from continuing or reestablishing the challenged conduct or any similar arrangements;

(c) restricting communications among Defendants concerning pricing, production, or supply, except as necessary for legitimate and properly safeguarded activities; and

(d) requiring Defendants to implement and maintain effective antitrust compliance programs subject to independent oversight.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A. The Court determine that this lawsuit may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and the undersigned counsel as Class Counsel, and direct that notice of this lawsuit, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      Plaintiff and the Class be awarded damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiff and Class Members be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing or maintaining, any conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their co-conspirators, affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company information;

- 97 -

F.      Plaintiff and Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiff and Class Members recover the costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiff and Class Members be granted such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED:  April 30, 2026                    LIDDLE SHEETS P.C.


/s/ Steven D. Liddle
STEVEN D. LIDDLE (P45110)
LAURA L. SHEETS (P63270
MATTHEW Z. ROBB (P81665)
D. REED SOLT (P86302)
975 East Jefferson Avenue
Detroit, MI  48207
Telephone:  313/392-0015
sliddle@lsclassaction.com
lsheets@lsclassaction.com
mrobb@lsclassaction.com
rsolt@lsclassaction.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
MARK J. DEARMAN
NICOLLE B. BRITO
ALEXANDER C. COHEN
ISABELLE KLAYMAN
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
nbrito@rgrdlaw.com
acohen@rgrdlaw.com
iklayman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID MITCHELL
ALEXANDRA S. BERNAY
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
davidm@rgrdlaw.com
xanb@rgrdlaw.com
ashingler@rgrdlaw.com

Attorneys for Plaintiff

- 99 -